## STATE OF CONNECTICUT *v.* VINCENT EDWARDS, JR.
### (12436)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued April 1—decision released August 12, 1986

*Jon L. Schoenhorn,* special public defender, for the appellant (defendant).

*Susan C. Marks,* deputy assistant state's attorney, with whom, on the brief, was *John M. Bailey,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, Vincent Edwards, Jr., was found guilty by a jury on November 23, 1983, of larceny in the fifth degree in violation of General Statutes § 53a-125a, accessory to robbery in the second degree in violation of General Statutes § 53a-135 (a) (1),[1] and forgery in the second degree in violation of General Statutes § 53a-139. He received

---

[1] General Statutes § 53a-135 (a) (1) provides: "ROBBERY IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of robbery in the second degree when he commits robbery and (1) he is aided by another person actually present. . . ."

an effective sentence of ten years and he appealed from the judgment of conviction.

The defendant raises eight issues on appeal. He claims that: (1) the state failed to prove beyond a reasonable doubt that the defendant was guilty of being an accessory to robbery in the second degree; (2) because of a conflict of interest, the defendant was denied his constitutional right to effective assistance of counsel; (3) the court erred in permitting a witness to make an in-court identification; (4) the state failed to prove the offense of forgery in the second degree beyond a reasonable doubt; (5) the court's instruction to the jury on the use of a false name violated the defendant's constitutional rights to due process and an impartial jury; (6) the trial court erred in failing to instruct the jury on a prior consistent statement; (7) the trial court erred in failing to instruct the jury on the inherent unreliability of accomplice testimony; and (8) the defendant was unconstitutionally denied his right on voir dire to question prospective jurors concerning their attitudes towards civil rights issues.

The jury could have reasonably found the following facts: Martin Katz, an owner of the Camera Corner on the Silas Deane Highway in Wethersfield, was working alone in the store at approximately noon on January 13, 1983. A black male, subsequently identified by Katz as the defendant, came into the store and inquired about renting a camera. Katz handed a camera to the defendant to examine and he returned it and left the store. A few minutes later, the defendant reentered the store and asked to see the camera again. As Katz held the camera, the defendant grabbed it and ran from the store. Kevin Sweeney, who visited Katz frequently, had just driven into the store parking lot, saw a man run from the store and enter the passenger side of a tan station wagon. Another individual was on the driver's side of the station wagon and the engine was

running. Because Sweeney considered the man's actions to be suspicious, he noted the license plate number of the car. Sweeney entered the store and gave the plate number to Katz, who reported it to the Wethersfield police at 11:56 a.m. Katz estimated that Sweeney entered his store less than one minute after the defendant had fled with the camera.

The Wethersfield police department received a second complaint at 11:58 a.m. of a robbery at the Finast supermarket parking lot, approximately one-quarter mile south of the Camera Corner on the Silas Deane Highway. Veda Johnson, seventy-eight years old, had just finished putting groceries from a shopping cart into her car when she heard footsteps behind her and was then pushed into the cart. At the same time, she felt someone tugging at the purse on her left arm and saw a man run toward the rear of the store. Johnson saw a car come from behind the supermarket building and slow down when it approached the man running toward it. The passenger door opened and the man entered a "dirty yellow," "light-colored" station wagon which passed within thirty feet of her. She described the robber as a black male, twenty to twenty-five years old, wearing dark clothes with "medium conventional Afro hair," with no facial hair and about five feet, eleven inches tall. The driver of the car also appeared to be a black male.

At 12:15 p.m., a Wethersfield police officer on patrol responded to the radio broadcast of the camera store theft which included the license plate number of the car involved. The officer stopped a car matching the description on Wethersfield Avenue in Hartford. The defendant, who was the driver of the car, and the other occupant, Danny Rhodes, were placed under arrest and the car was searched. Johnson's pocketbook and some of its contents were found under the passenger's seat and the camera was found inside the glove compartment.

Shortly thereafter, at the Wethersfield police station, a department store credit card belonging to Johnson was found in the defendant's possession.

At the Wethersfield police station, the defendant was fingerprinted, filled out a fingerprint card and misidentified himself as Michael Anthony. He stated that he had taken the camera from the store but that his partner had taken the pocketbook. Rhodes, who had also misidentified himself to the police, testified that he was the driver of the car when the defendant grabbed Johnson's pocketbook.

## I

The defendant's first claim of error, encompassing three independent claims relating to the second count of the substitute information,[2] is that the state failed to prove beyond a reasonable doubt the offense of accessory to robbery in the second degree.[3] The defendant claims in his first subissue that he cannot be convicted under an information which charges him "with a sin-

[2] The second count of the substitute information stated: "ROBBERY IN THE SECOND DEGREE

"And the said Attorney further accuses VINCENT EDWARDS, JR. of ROBBERY IN THE SECOND DEGREE and charges that in the town of Wethersfield on or about the 13th day of January, 1983, the said Vincent Edwards, Jr. did commit the crime of ROBBERY IN THE SECOND DEGREE and was aided by another person actually present, in violation of 53a-135 (a) (1) of the General Statutes, or that acting with the mental state required for the commission of the crime of Robbery in the Second Degree, did solicit, request, command, importune or intentionally aid another person to engage in conduct which constituted the crime of ROBBERY IN THE SECOND DEGREE, in violation of §§ 54a-135 (a) (1) and 53a-8 of the General Statutes."

[3] The state claims that this claim is not properly before this court as it was not raised at trial and the defendant failed to file a motion to dismiss the robbery count prior to trial. We disagree. A thorough review of the transcript reveals that the defendant engaged in a lengthy colloquy with the court in which he objected to the disjunctive information and to the state's failure to provide a bill of particulars. We therefore consider this claim to be properly before the court.

gle offense by alternative means stated disjunctively within a single count." The defendant was charged with robbery in the second degree or with aiding another person in the commission of robbery in the second degree under General Statutes §§ 53a-135 (a) (1) and 53a-8.[4] He claims that whether the defendant was a principal or an accessory are two "mutually exclusive" theories of liability.

The defendant cites *State* v. *Eason,* 192 Conn. 37, 470 A.2d 688 (1984), in support of his claim. In *Eason,* supra, 40, we stated that the substitute information in that case had been improperly drafted becaus it had charged the commission of two or more offenses in the alternative and therefore did not definitely apprise the defendant of the specific charge against him. See *State* v. *Cofone,* 164 Conn. 162, 167, 319 A.2d 381 (1972). *Eason,* however, is factually inapposite to the facts of this case. In *Eason,* the defendant had been charged with two distinct criminal acts which violated one statute in the same count. *State* v. *Eason,* supra, 40–41. In the instant case, the defendant was charged in the second count with only one crime, the crime of robbery in the second degree. While the defendant specifically noted during oral argument and in his brief that he was not basing his argument on the belief that there were two offenses at issue, his reasoning presupposes that there are two separate offenses.

As we have only recently reiterated, there is no such crime as being an accessory. *State* v. *Harris,* 198 Conn. 158, 163, 502 A.2d 880 (1985); *State* v. *Baker,* 195 Conn. 598, 608, 489 A.2d 1041 (1985). The defendant was

---

[4] General Statutes § 53a-8 provides: "CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

charged with one substantive offense, robbery in the second degree. "The accessory statute merely provides alternate means by which *a* substantive crime may be committed." (Emphasis added.) *State* v. *Baker,* supra. The defendant also raises the claim that because he was charged in the "disjunctive" the information, based on "logic and legal precedent," failed to allege the commission of all the necessary elements of a charged offense and, therefore, failed to charge that offense. We disagree. The defendant was charged with the commission of all the elements necessary for robbery in the second degree. Even if the information had only included the language of General Statutes § 53a-135 (a) (1), the defendant could not be heard to complain if the jury had been instructed on both principal liability and accessorial liability under § 53a-8.

"If [the defendant was] accused of committing crime X, or crime Y, or crime Z, he understandably may be left in a quandary." *State* v. *Cofone,* supra, 167. That was not the case here. The defendant was charged with only one crime and the jury, persuaded that the facts demonstrated accessorial liability as one of the alternative means by which the crime could have been committed, found the defendant guilty of violating General Statutes § 53a-135 (a) (1) because he intentionally aided in the commission of the robbery. The defendant's claim must fail.

The defendant raises a second subissue in which he claims that "because the defendant was acquitted of the principal offense of robbery in the second degree he cannot as a matter of law be convicted as accessory." The defendant conceded at oral argument and in his reply brief that, unless limited to its facts or unless reconsidered, *State* v. *Harris,* supra, was dispositive of his claim. We decline to limit *Harris* to its facts or to reconsider its holding. As we stated in *Harris,* supra, 166, the "jury did not 'acquit' [the defendant] of the

charge of robbery in the second degree. On the contrary, the jury found him guilty of violating General Statutes § 53a-135 (a) (1) by reason of the liability imposed on him through General Statutes § 53a-8." The defendant's claim is without merit.

The defendant's third subissue is that, under the facts of this case, he was not guilty of accessory to robbery in the second degree. Because the jury found the defendant guilty by reason of accessorial liability, he claims that the jury had to find that Rhodes had been the principal and that the defendant had been the driver of the car. The victim testified that, after her pocketbook had been taken, the robber fled toward a car as it rounded the corner of the supermarket, entered it, and then he smiled and waved at her from the passenger seat as the car drove by, approximately thirty feet away.

General Statutes § 53a-135 (a) (1) requires that the person who commits the robbery be "aided by another person *actually present.*" (Emphasis added.) The defendant claims that the driver of the getaway car, "whose very existence is unknown until *after* the commission of the crime," cannot be actually present during the crime as a matter of law. We agree with the defendant.

Penal statutes must be strictly construed; *State* v. *Paradise,* 189 Conn. 346, 352, 456 A.2d 305 (1983); *State* v. *Tedesco,* 175 Conn. 279, 291, 397 A.2d 1352 (1978); but such construction must accord with common sense and commonly approved usage of the language. General Statutes § 1-1; *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983). The Commission To Revise the Criminal Statutes comments that § 53a-135 "makes the presence of an accomplice an aggravating factor. The rationale is that the accomplice is equal to a person armed and therefore would generate a higher degree

of fear in the victim. . . ." General Statutes Annotated § 53a-135 (West 1972). The comment implies that the presence of the accomplice must be both temporally and physically proximate to the robbery such that the victim is aware of the accomplice during the robbery. The state claims that there is "no suggestion in the language of the statute that the concept of actual presence hinges on the victim's perception of such presence." An analysis of the entire statute indicates more than a suggestion of what "actually present" means. The offense of robbery in the second degree, as distinguished from robbery in the third degree,[5] requires either of two additional elements—another person actually present or the display or threatened use of a deadly weapon or dangerous instrument. The higher classification of felony attached to robbery in the second degree indicates that the legislature considered it to be a more serious crime because it was likely to have a more severe effect upon the victim. The victim's sensory perception of either the additional person or the dangerous instrument is the aggravating factor that increases the legislatively designated intolerability of the offense. This sensory perception by a robbery victim of "another person actually present," be it by observation, feeling or belief, presents a factual determination in each case unless such a perception could not exist, as a matter of law, as it could not in this case. The "actually present" element also has factored into its existence or absence in a particular case the location, vis-a-vis the victim at the time of the robbery, of that other person claimed to be "actually present."[6]

---

[5] General Statutes § 53a-136 (a) provides: "A person is guilty of robbery in the third degree when he commits robbery."

[6] While the evidence was insufficient to sustain the conviction on the second count of the substitute information charging the crime of accessory to robbery in the second degree, it did suffice to sustain a conviction for the lesser included offense of accessory to robbery in the third degree. The jury's verdict on the second count necessarily determined that the state

If the victim is unaware of the accomplice at the time of the robbery or the defendant is armed with a deadly weapon but does not display or threaten its use, then the aggravating factor enhancing the offense to robbery in the second degree is absent because there has been no additional effect upon the victim other than the robbery itself.

Under the facts of this case, we conclude that the defendant, as the driver of the getaway car, was not "actually present" during the robbery. The victim testified that after her purse had been grabbed she turned around and saw an individual running away from her toward the back of the store. At this time, the victim saw a car "coming from behind the store" which then

had proven all the elements of accessory to robbery in the third degree beyond a reasonable doubt upon which the trial court instructed the jury. Under the circumstances of this case, the reduction of the defendant's conviction on the second count to the lesser included offense cannot prejudice the defendant. *State* v. *Scielzo,* 190 Conn. 191, 205, 460 A.2d 951 (1983); *State* v. *Coston,* 182 Conn. 430, 437, 438 A.2d 701 (1980); *State* v. *Saracino,* 178 Conn. 416, 421, 423 A.2d 102 (1979); *State* v. *Grant,* 177 Conn. 140, 148–49, 411 A.2d 917 (1979).

In *Dickenson* v. *Israel,* 482 F. Sup. 1223, 1225 (E.D. Wis. 1980), the court said: "State and federal appellate courts have long exercised the power to reverse a conviction while at the same time ordering the entry of judgment on a lesser-included offense. See, e.g., *United States* v. *Cobb,* 558 F.2d 486, 489 (8th Cir. 1977); *Austin* v. *United States,* 127 U.S.App.D.C. 180, 191–192, 382 F.2d 129, 140–142 (D.C.Cir.1967); *Luitze* v. *State,* 204 Wis. 78, 234 N.W. 382 (1931). The usual situation in which this occurs is when there is insufficient evidence to support one of the elements of an offense. A court may be reluctant to overturn an entire conviction when there is ample evidence to support a lesser-included charge which does not contain the insufficiently proven element. The authority to order the entry of judgment on the lesser-included offense is both statutory, see, e.g., 28 U.S.C. § 2106, and based on the common law. The constitutionality of the practice has never seriously been questioned." See also *Miller* v. *State,* 426 A.2d 842, 845 (Del. 1981) (first degree arson reduced to second degree arson); *State* v. *Smith,* 4 Kan. App. 2d 149, 152–53, 603 P.2d 638 (1979) (possession with intent to sell reduced to possession); *People* v. *Monaco,* 14 N.Y.2d 43, 47, 197 N.E.2d 532, 248 N.Y.S.2d 41 (1964) (second degree murder reduced to first degree manslaughter); *State* v. *Eiseman,* 461 A.2d 369 (R.I. 1983) (possession of cocaine with intent to deliver reduced to possession).

slowed enough to allow the individual who had grabbed her pocketbook to enter the passenger side. Although we review a claim concerning the sufficiency of the evidence in a manner most favorable to sustaining the jury verdict, the evidence in this case was not sufficient to justify a verdict of accessory to robbery in the second degree as charged. The defendant was not "actually present" until sometime after the commission of the robbery. Cf. *State* v. *Miller,* 14 Or. App. 608, 513 P.2d 1199, 1201 (1973) (defendant guilty of robbery in the second degree; aided by individual standing in the parking lot twenty-five feet from the victim whom she observed *during the course of the attack*).

Because the element of actual presence was not proven, this case must be remanded for the judgment to be modified as to the second count of the substitute information and for resentencing on the lesser included offense of accessory to robbery in the third degree.

## II

The defendant claims that he was denied his state and federal constitutional rights to effective assistance of counsel and due process when he was represented by the public defender's office despite a "known conflict" of interest and because his codefendant, still represented by the public defender's office, became a witness against him.

On January 14, 1983, both the defendant and his codefendant, Rhodes, were presented to the Superior Court for the fifteenth geographical area and at that time they were represented by the same assistant public defender, Lorenzo Smith. The trial court at that time pointed out to Smith that he "might consider having a Special Public Defender appointed. There seems to be a certain conflict." The assistant state's attorney agreed with the court. The files were thereafter transferred to the office of the public defender for the

Hartford-New Britain judicial district. On February 10, 1983, Arthur Giddon, the public defender for the judicial district of Hartford-New Britain, was assigned to represent Danny Rhodes. Rhodes was interviewed that same day and the defendant was interviewed the next day by the same investigator for the public defender's office. Richard Kelly, an assistant public defender working in the same office as Giddon, entered an appearance for the defendant on February 15, 1983. The investigator had noted on the defendant's file on February 11, 1983, a suggestion that a conflict existed between Rhodes and the defendant.

On April 6, 1983, attorney Jon L. Schoenhorn was appointed as a special public defender to represent the defendant and was given the defendant's file and its contents by the public defender's office. On June 10, 1983, the defendant filed a "motion to dismiss or motion to suppress statements and testimony of co-accused [Rhodes] due to conflict of interest." On October 3, 1983, the defendant filed a motion to disqualify the public defender's office because of a conflict of interest. A hearing was held on the motion to disqualify on October 13, 1983, at which time counsel for the defendant stated that "a per se conflict of interest has arisen because of the status of the public defender['s] office having represented both, and now, offering more or less, to have the codefendant, Mr. Rhodes, act as a quasi state's witness against Mr. Edwards . . . ." In addition, counsel noted that Giddon, counsel for Rhodes, had been appointed to represent the defendant in a 1976 arrest. Counsel for the defendant also stated that Rhodes, at the time of his arrest, "apparently" gave a statement which implicated the defendant and it was not until two months later that a special public defender was appointed. The public defender stated that there was not a conflict of interest. The court denied the motion stating that there was no "impropriety involved."

The motion to suppress Rhodes' statement and testimony was heard on November 17, 1983, outside of the presence of the jury. Kelly testified that he did not recall any conversations with Giddon about Giddon's client, Rhodes. Counsel for the defendant then called Giddon to testify. Giddon stated to the court that he had not seen the defendant's file at any time, that it was in Kelly's possession in the public defender's office and that he had not received information concerning the defendant from any source other than Rhodes. The defendant also moved to compel Giddon to produce the investigator's report of the interview with Rhodes. The motion was denied as having been improperly before the court. A statement made to the Wethersfield police by Rhodes was included in the defendant's file given to the defendant by the public defender's office. The assistant state's attorney trying the case stated for the record that all testimony that he would elicit from Rhodes was contained in the January, 1983, statement that was also in the possession of the defendant's counsel. The court denied the defendant's motion to suppress Rhodes' testimony.

The defendant raises three claims of error with respect to the representation of Rhodes by the public defender's office. The defendant claims that the trial court erred by failing to disqualify the public defender's office from further representation of Rhodes and that the proper remedy for the conflict of interest was the exclusion of Rhodes' testimony from the defendant's trial. The defendant also claims that the trial court erred when it denied the defendant the right to review the investigator's report on Rhodes. The defendant has not sufficiently demonstrated how the continued representation of *Rhodes* by the public defender's office harmed *his* own right to effective assistance of counsel and a fair trial. After a conflict of interest was noted by the public defender's office, the office transferred

the defendant's case to outside counsel. The defendant characterizes the period between the public defender's initial representation of the defendant in geographical area number fifteen and the transfer of his case as a "flagrant abuse" and an "ethical violation" that was not "ameliorated" by the appointment of a special public defender.

The trial court has "broad discretionary power to determine whether an attorney should be disqualified for an alleged . . . conflict of interest." *State* v. *Jones,* 180 Conn. 443, 448, 429 A.2d 936 (1980). Moreover, "[i]n determining whether the Superior Court has abused its discretion in denying a motion to disqualify, this court must accord every reasonable presumption in favor of its decision." *State* v. *Jones,* supra. Any conflict of interest that arose in this case when the two public defenders were independently representing the two codefendants who were to be tried in separate proceedings was ameliorated by the appointment of a special public defender for the defendant. At the extensive hearing held on this issue, both Giddon and Kelly testified. The counsel for Rhodes explicitly stated on the record that he had not acquired any information about the defendant by reason of the defendant's brief representation by the public defender's office. This situation is not factually analogous to joint representation at a joint trial by two attorneys of two codefendants; see *Dukes* v. *Warden,* 406 U.S. 250, 92 S. Ct. 1551, 32 L. Ed. 2d 45, reh. denied, 407 U.S. 934, 92 S. Ct. 2464, 32 L. Ed. 2d 817 (1972); or the multiple representation of codefendants by one attorney; see *Holloway* v. *Arkansas,* 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); or a joint trial with each codefendant independently represented by public defenders. See generally "Developments in the Law—Conflicts of Interest in the Legal Profession," 94 Harv. L. Rev. 1244, 1380–1413 (1981).

The defendant, citing *Baty* v. *Balkcom,* 661 F.2d 391 (5th Cir. 1981), cert. denied, 456 U.S. 1011, 102 S. Ct. 2307, 73 L. Ed. 2d 1308 (1982), asserts that, when an actual conflict exists, prejudice need not be shown and is instead presumed. In *Baty,* a sixth amendment ineffective assistance of counsel case, the Fifth Circuit stated that it "requires that the conflict be actual, not speculative." Id., 395. The court then stated that "[a]n actual conflict exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel *is* representing." (Emphasis added.) Id. The state claims that because the conflict is obviated when one of the codefendants obtains independent counsel, as the defendant did in this case, "it is neither logically necessary nor legally possible in the absence of some showing of prejudice, to require the other co-defendant also to obtain different representation." Under the circumstances of this case, in which an extensive hearing was conducted, we conclude that prejudice to the defendant cannot be presumed but must be shown to have occurred. See *People* v. *Robinson,* 79 Ill. 2d 147, 402 N.E.2d 157 (1979). The defendant has not demonstrated how the continued representation of Rhodes by the public defender's office harmed him. Although Rhodes testified for the state in the defendant's trial, the state did not obtain any information from the public defender's office to aid it in its use of Rhodes as a witness.

The trial court did not abuse its discretion in failing to disqualify the public defender's office from further representation of the codefendant Rhodes.[7]

---

[7] Because of our ruling on this issue, we need not reach the issue of whether the trial court, as "the proper remedy for a conflict of interest," erred in refusing to bar the testimony of Rhodes at the defendant's trial.

The defendant next claims that the trial court erred in denying the defendant the right to review the interview report on Rhodes prepared by the investigator for the public defender's office. The defendant filed a motion to compel production of the investigator's report of his interview with Rhodes. Rhodes' counsel, during the hearing on the motion conducted outside the presence of the jury, claimed that the notes were his work product as well as a privileged attorney-client communication. The defendant's counsel agreed with Rhodes' counsel, but stated that because the defendant was also represented by the public defender's office at the time the investigator had made his report on Rhodes, he was entitled to the report. Although the court denied the defendant's motion to compel production under Practice Book § 809 because it was directed to the public defender's office, a nonparty, the court permitted testimony on the question of "whether or not the witness [Giddon], being under the jurisdiction of the Court, with his file, must produce the document." The defendant asked Giddon, Rhodes' counsel, to turn over to him the investigator's interview statement of Rhodes taken on February 10, 1983. Giddon refused.

The defendant relies heavily upon our holding in *State v. Cascone,* 195 Conn. 183, 487 A.2d 186 (1985), as support for his claim that the trial court should have ordered disclosure of the report. In *Cascone,* we employed a "fact-specific balancing test" to resolve the competing interests of the attorney-client confidentiality privilege and the defendant's need for access to evidence. *State v. Cascone,* supra, 189. In *Cascone,* we concluded that an exculpatory statement allegedly made by a codefendant to an attorney who had represented both defendants at the time it was made should have been admitted because the "harm of its exclusion outweighed the cost of its admission." Id., 190. Unlike *Cascone,* the codefendant Rhodes was still represented

by the attorney to whom the statement in issue had been given.[8] The defendant claims that this difference in factual circumstances does not militate against the same conclusion in this case as in *Cascone.* We do not agree. In *Cascone,* a privately retained attorney jointly represented both defendants when the alleged statement was made in the presence of both defendants. At the trial that attorney no longer represented either defendant. In this case, Rhodes was at all times represented by the office of the public defender and, under the fact-specific balancing test, this factor weighs heavily in favor of nondisclosure because of the potential for injury to the ongoing attorney-client relationship. In addition, the defendant was permitted in this case to cross-examine Rhodes at length about the fact that he had made a statement to the public defender's investigator. He questioned Rhodes as to whether the statement differed from his statement to police and from his in-court testimony, to which Rhodes responded that he did not remember. The jury was free to weigh the codefendant's inability to recall various statements as a factor of the codefendant's credibility. The trial court did not, under the circumstances, err in denying the defendant the right to review the investigator's report.

The defendant raises as a "separate and distinct ground" for requiring disclosure the state and federal constitutional rights to confrontation, compulsory process and effective assistance of counsel. The state counters that this claim was never distinctly raised in the trial court and should not be reviewed. We agree with the defendant that he sufficiently raised these issues during his colloquy with the trial court to warrant appellate review. During his argument to the trial court, he

---

[8] As the defendant notes in his brief, statements made to an agent or employee of the attorney, in this case the investigator, if necessary to the consultation, will not preclude a reasonable expectation of confidentiality. See *State* v. *Cascone,* 195 Conn. 183, 186–87, n.3, 487 A.2d 186 (1985).

stated at least twice that the purpose behind the request for the document was to show a conflict back in February, 1983. The defendant claims that the attorney-client privilege may not be used to deny the defendant the information from the report necessary to cross-examination. The defendant claims that because Rhodes cooperated with the state as a witness against the defendant the public defender's office "became, in essence, an agency of the State's Attorney's Office . . . ." We do not agree with the defendant's claims.

The state, as already noted, responded to a question from the court that the only information that would be used to elicit testimony from Rhodes was his statement to the Wethersfield police. Both the state and the defendant were, and had been, in possession of this statement. Because we view the defendant's claim that the public defender's office was an "agency" of the state's attorney's office as without merit, a claim that any material generated by the relationship between Rhodes and his public defender should have been turned over to the defendant is also without merit. The attorney-client relationship between Giddon and Rhodes still existed at the time of trial because Rhodes' sentencing was to be scheduled only after his testimony in the defendant's case. The fact that Rhodes' sentencing was scheduled in relation to the defendant's trial, the existence of the plea bargain Rhodes entered into in exchange for his testimony in this case, the original charges, the reduced charges and the fact that he would be released from jail upon completion of his testimony were all brought to the jury's attention during the defendant's thorough cross-examination of Rhodes.

In order to determine whether the denial of the statement violated the defendant's right to confrontation, we review the cross-examination of Rhodes to determine whether it was unduly hampered. *State* v. *Wilson,* 188 Conn. 715, 721, 453 A.2d 765 (1982). We

must examine the entire cross-examination. *State* v. *Asherman,* 193 Conn. 695, 721, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Our review of the transcript reveals that Rhodes was extensively cross-examined by the defendant. The defendant's claim that he was denied his right to compulsory process must also fail in light of his failure to call Watson, the investigator, as a witness at trial. Although his attempt to call the investigator as a witness during the hearing, in the absence of the jury, on the motion to compel production of the report was precluded by the investigator's attorney's claim that the information was privileged, it did not foreclose him from attempting to call him as a witness when the trial resumed.

The defendant claims that because Watson was his investigator at the time Rhodes' statement was taken, any information obtained by him in the course of the investigation was required to be disclosed to the defendant. The investigator, employed by the public defender's office, was also the investigator for Rhodes and it would be illogical to conclude that the defendant would be entitled to Rhodes' interview any more than Rhodes would be entitled to the defendant's interview. In this circumstance the attorney-client privilege, which was claimed as a reason for nondisclosure, is not transformed "from a shield into a sword"; *State* v. *Cascone,* supra, 188; because the defendant's right to effective assistance of counsel, to confrontation, and to compulsory process are not implicated by this factual circumstance. We noted in *Cascone* that, although the prohibition on the disclosure of the communication "seriously impeded the adjudicative process," it did not make "any further significant inroads into the [attorney-client] privilege." *State* v. *Cascone,* supra, 189. The court's prohibition on the disclosure of the statement made by Rhodes to the investigator that

allegedly incriminated Rhodes as the principal in the purse-snatching incident clearly did not seriously impede the adjudicative process because the jury, without this additional evidence, found the defendant guilty of being an accessory to robbery and implicitly not guilty of being a principal.

We cannot agree with the defendant that the trial court's refusal to order disclosure of the investigator's report was in violation of his constitutional rights as claimed. There is no error.

### III

The defendant next claims that the trial court erred in permitting Katz to make an in-court identification after having ordered the defendant to participate in an out-of-court procedure that violated provisions of the Practice Book. The defendant filed a motion prior to trial to suppress all in-court identification testimony because it would be "unnecessarily and impermissibly suggestive." A hearing was held on the motion and at the defendant's suggestion he was seated in an adjacent jury room to avoid being viewed by the victim.

Katz testified at this hearing that he was standing behind a counter in his store when the defendant entered and spoke with him. He was "face to face" with the defendant, who was approximately two and a half to three feet away, for three minutes. The lighting conditions in the store were "quite good" throughout his discussion with the defendant. The defendant then left the store but reentered less than two minutes later. Katz testified that the defendant was in his store approximately fifty seconds the second time before he fled with the camera that he had been examining. Katz testified that after his camera had been taken from his store, he was taken by Wethersfield police to Wethersfield Avenue in Hartford where the defendant had been apprehended. At no time did Katz exit the police vehi-

cle nor was he asked to make an identification. The police vehicle was approximately twenty-five feet from the station wagon in which the defendant and Rhodes were seated. Katz testified that he observed an individual exit the vehicle but this was not the person who had been in his store. He did not have an unobstructed view of the second individual in the car and could not make any observation of him. Katz was never shown any photographs in connection with the robbery.

Katz testified that the individual who had taken the camera was a "medium-dark skinned black with smooth skin . . . short hair, dark, not extraordinarily tall . . . between five eight, five nine at the most." He testified that he "could be quite wrong about height. . . . [his] was medium musculature."

During cross-examination, Katz was asked if he had looked into the window on the courtroom door prior to the commencement of the identification hearing. Katz answered that he had looked in to see if a jury was present and that he had seen an individual in a blue shirt or sweater but that he was not able to recall the individual's race.

The trial court then said that the state could not be permitted to ask Katz to make an in-court identification because he had not previously identified the defendant. The court offered to give the state "an opportunity of having some kind of a lineup." The state thereafter moved to require the defendant to participate in a lineup pursuant to Practice Book §§ 775-778. The defendant was permitted to change from the blue shirt or sweater that he had been wearing to a different colored sweater before the lineup was conducted. The lineup consisted of seven individuals, including the defendant, who had been held in the court lockup. Defense counsel was present at the lineup when Katz selected the defendant. Katz testified outside of the

presence of the jury that the defendant's hair was different at the lineup than on the day of the theft and that his "musculature" was slightly less. Katz testified that the individual that he had selected in the lineup was the person who, "in [his] best recollection and opinion, walked into the shop . . . and took the camera," that it was "more probable than not that it [was] the same person," and that the defendant was "very much more so likely than not" the man who took the camera. Defense counsel stated after the lineup had been conducted that the individuals "at the very least had similar—more or less similar hairstyles to [the defendant's]," but that the amount of facial hair each individual had varied and that the "heights greatly differ[ed]."

A defendant who challenges a ruling on a motion to suppress identification evidence must prove that (1) the identification procedures were unnecessarily suggestive, and (2) if found to have been so, the resulting identification was not reliable in the totality of the circumstances. *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Boucino,* 199 Conn. 207, 218–19, 506 A.2d 125 (1986); *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980).

The defendant claims that the individuals in the lineup were of "varied heights and builds and had varied hairstyles and facial hair." This claim contradicts much of what defense counsel brought to the trial court's attention. Defense counsel stated on his objection to in-court identification testimony that "the hairstyles of all except one individual was [sic] close to the defendant's short-cropped Afro hair . . . ." Defense counsel's claim that the individuals had varied amounts of facial hair does not necessarily indicate that the procedure was unnecessarily suggestive. See *State* v. *Villafane,* 171 Conn. 644, 658, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977) (corporeal lineup conducted in which only

two individuals, including the defendant, had moustaches). The defendant also claims that the participants in the lineup were of varying heights. Nonetheless, this factor, although possibly suggestive upon close scrutiny, was not unnecessarily suggestive in light of the entire procedure and Katz's certainty in selecting the defendant from the lineup. See *State* v. *Vass,* 191 Conn. 604, 610–11, 469 A.2d 767 (1983). The defendant has not met his threshold burden of proving that the lineup that had been conducted was impermissibly suggestive. In any event, evidence of the lineup and the selection made from it by Katz was at no time introduced at trial. The trial court did not err in concluding that the in-court identification of the defendant by Katz was reliable.

Even if we were to assume that the lineup procedure employed in this case had been unnecessarily suggestive, we agree with the trial court that the in-court identification was reliable in light of the factors set forth in *Manson* v. *Brathwaite,* supra. The factors to consider in determining reliability include the opportunity of the witness to view the defendant at the time of the incident, the witness' degree of attention, the accuracy of his prior description of the defendant, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. The court cited several of these factors in its denial of the defendant's motion to suppress, including Katz's opportunity to view the defendant, the good quality of the lighting in the store, Katz's attention to the defendant, and the certainty with which Katz selected the defendant from the lineup. Katz thereafter identified the defendant in court during the trial. On the basis of this record, we conclude that the defendant has failed to meet his burden of showing that the identification was unreliable.

The defendant claims on appeal that, although Practice Book § 776[9] requires the trial court to make a finding of probable cause that the evidence sought from an identification procedure is material and cannot be obtained from other sources, the trial court in this case "made no findings at all." When the state moved for a lineup, stating that the evidence sought could not be "obtained from other sources," the trial court specifically noted in response to the defendant's objection to the proposed identification procedure that "[he] failed to indicate how this could be done otherwise." The trial court also noted that the witnesses to be shown the lineup had not "previously been given the opportunity" to identify the defendant. The trial court thus made a sufficient finding of probable cause under § 776.

The defendant also claims that Practice Book §§ 779 through 781 were not followed by the court in granting the motion for a lineup. The state concedes that the defendant did not receive a written order setting forth the specific circumstances surrounding the lineup. The state did, however, fully and with particularity set forth the circumstances of the procedure it was seeking to conduct and even addressed a claim of the defendant concerning a change of sweaters for the defendant before the lineup was to be conducted. Defense counsel was present for the state's description of the lineup procedure and objected to certain portions of it, including the fact that the order was not in writing. Little benefit would have accrued to the defendant in this case

---

[9] Practice Book § 776 provides: "Upon motion of the prosecuting authority, the judicial authority by order may direct a defendant to participate in a reasonably conducted procedure to obtain nontestimonial evidence under Sec. 775, if the judicial authority finds probable cause to believe that:

"(1) The evidence sought may be of material aid in determining whether the defendant committed the offense charged; and

"(2) The evidence sought cannot practicably be obtained from other sources."

in requiring the order, which had been fully argued and to which objection had been made, to have been put in writing. The defendant did not move for a continuance in the proceedings in order to allow the state additional time in which to perfect the lineup nor did he request that there should be a delay in the proceedings in order to put the order in writing. The defendant's claim that none of the safeguards of § 781 had been followed is without merit. Section 781 (1), the only subsection applicable to the facts of this case, permits a defendant to be accompanied by counsel. Defense counsel was present while the lineup was conducted.

The trial court substantially complied with the requirements of the Practice Book and, in any event, because we have determined that the procedure used was not unnecessarily suggestive, the degree of compliance by the trial court did not affect the reliability of the in-court identification.

## IV

The defendant claims that the state failed to prove the offense of forgery in the second degree; General Statutes § 53a-139 (a);[10] beyond a reasonable doubt. James Mull, a Wethersfield police officer, testified that when he processed and photographed the defendant at police headquarters on January 13, 1983, the defendant identified himself as Michael Anthony. After the defendant's fingerprints had been taken on a card, Mull asked the defendant to "sign the card as he normally writes his name." The defendant affixed the name

[10] General Statutes § 53a-139 (a) (2) provides: "FORGERY IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed: . . . (2) a public record or an instrument filed or required or authorized by law to be filed in or with a public office or public servant . . . ."

Michael Anthony to the card in the presence of Mull. Mull learned the next day that the person who had signed the card was actually Vincent Edwards. It was stipulated at trial that the fingerprints on the card that bore the name of Michael Anthony were identical to those of the defendant's and that the fingerprints had been affixed by the same person, the defendant. Kenneth Monde of the Wethersfield police department testified that one advantage, inter alia, to an individual in giving a false name upon arrest includes "favorable bond conditions" because the use of a false name would "lead [the police] to the conclusion that [the individual] has no prior arrest record." See *People* v. *Bigus*, 115 App. Div. 2d 751, 497 N.Y.S.2d 145 (1985) (fingerprint card). Rhodes testified that he had also used another person's name when arrested with the defendant in order to "get a low bond" because he had a prior record and the person whose name he used had "never been in any trouble." Rhodes also testified that he had known the defendant for a couple of years and that he had known him by the name Vincent Edwards.

The defendant claims that the statute requires that the evidence establish beyond a reasonable doubt that the name was, in fact, "false," not that the defendant was known by another name at trial. General Statutes § 53a-139 (a) (2) does not require that the state prove that the name used by the defendant was a "false name" but rather that the defendant, "with intent to defraud, deceive or injure another," falsely made or completed a public record. In construing a similar statute, the New York Court of Appeals stated that "[w]hile generally it is not illegal per se to adopt an alias or a nom de plume, freedom to do so reaches its limits when the practice is accompanied by a fraudulent design . . . ." *People* v. *Briggins*, 50 N.Y.2d 302, 307, 406 N.E.2d 766, 428 N.Y.S.2d 909 (1980).

The use of a fictitious or assumed name clearly falls within the parameters of General Statutes § 53a-139 (a) as long as there is also sufficient evidence of the person's intent in using that name. See generally 4 Wharton, Criminal Law (14th Ed. Torcia) § 500; note 49 A.L.R.2d 852, 856. In reviewing a sufficiency of the evidence claim raised on appeal, we must determine whether, " ' "viewing the evidence favorably to sustaining the verdict, the trier could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." ' " *State* v. *Rivera,* 200 Conn. 44, 48, 509 A.2d 505 (1986); *State* v. *Zayas,* 195 Conn. 611, 620, 490 A.2d 68 (1985). The intent which the defendant had in using a name other than the one by which he was known to his friends was a question for the jury. "Intent is a mental process which ordinarily can be proven only by circumstantial evidence." *State* v. *Zdanis,* 182 Conn. 388, 396, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). "The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available." *State* v. *Rodriguez,* 180 Conn. 382, 404, 429 A.2d 919 (1980); see *State* v. *Chace,* 199 Conn. 102, 105, 505 A.2d 712 (1986); *State* v. *Martin,* 195 Conn. 166, 170, 487 A.2d 177 (1985). This court will not disturb the trier's determination if, after viewing the evidence in a light most favorable to sustaining the verdict, any trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State* v. *Scielzo,* 190 Conn. 191, 197, 460 A.2d 951 (1983). The testimony at trial indicated that the defendant gave a "fake name" and that he was aware, in doing so, that he did not want the police to know of his "long [criminal] record" because it could affect his bond.

Our review of the record in this case reveals that there was sufficient evidence from which the jury could reasonably have found the requisite intent proven, as well as the other elements necessary for a conviction of forgery in the second degree.

V

The defendant claims that the court's instructions on the use of a false name as an indication of consciousness of guilt effectively directed the jury to find the defendant guilty of forgery in violation of his state and federal constitutional guarantees of due process and an impartial jury.

The court, using almost identical language, instructed the jury on "consciousness of guilt" on two separate occasions. After reviewing for the jury the evidence presented on the camera store larceny and the elements of the offense charged, the court stated that the jury "may consider the legal principle of consciousness of guilt. The principle applies when a defendant does an act from which one can infer that he has attempted to avoid detection or avoid facts which would lead to his conviction, and as you recall, Detective Hafner indicated that the defendant gave another—a name other than that which we know him by today, and that name was Michael Anthony." The court instructed the jury in similar language on consciousness of guilt following a review of its instructions on the evidence on the robbery of the victim's purse. The defendant excepted to the two instructions on consciousness of guilt following the court's charge.

The defendant concedes that an instruction concerning consciousness of guilt is "entirely proper when such evidence is admitted at trial," and that " 'assumption of a false' name is one manner in which an inference of guilty conscience may be shown." 2 Wigmore, Evidence (3d Ed. 1940) § 276 (4), p. 111. The defendant

maintains, however, that this instruction is improper and prejudicial when the use of a false name is an element of an offense for which the defendant is also on trial, in this case General Statutes § 53a-139 (a). The defendant contends that because the court, in its instructions, *"presumed"* the name used by the defendant was "false," it directed the jury to find the defendant guilty of forgery. The trial court, however, did not instruct on consciousness of guilt in its discussion of the elements of forgery in the second degree. In order for the jury to have found the defendant guilty of forgery in the second degree, it had to have found all the elements of the offense charged, of which the requirement that the actor "falsely makes [or] completes . . . a written instrument . . ." is only one element. The court's instruction did not direct the jury to find that the defendant had acted with the intent required to commit forgery in the second degree but only stated that he had used a name "other than that which we know him by today."

The constitutional adequacy of jury instructions is not to be determined by examining instructions in isolation but by examining the instruction as a whole. *State v. Brown,* 199 Conn. 14, 27, 505 A.2d 690 (1986). The trial court correctly instructed the jury that the state had the burden of proof of every element of each offense. The court commented on a fact that was virtually undisputed at trial—that the defendant used a different name after he had been arrested than he was known by at trial. The court did not withdraw from the trier the issue of whether the defendant had the necessary intent in using the "false" name to be guilty of forgery in the second degree. See *State v. Collette,* 199 Conn. 308, 318, 507 A.2d 99 (1986). It properly left that issue of fact for the jury to decide. We conclude that the instructions to the jury, read in their entirety, did

not effectively amount to a direction of a verdict and did not deny the defendant his right to due process and an impartial jury.

## VI

The defendant claims that the trial court erred by failing to instruct the jury on the "proper treatment to be given to a purported prior consistent statement." On the state's direct examination, Rhodes testified that he had been the driver of the car and that the defendant had stolen the camera and the purse. On cross-examination, Rhodes testified that he had been interviewed by the public defender's office after he had been arrested and that a statement had been taken from him. The state objected to this line of questioning on the ground that it exceeded the scope of the direct examination. Defense counsel stated that his claim went to "prior inconsistent statements" and "impeachment." The state's objection was overruled. The defendant then questioned Rhodes as to whether that interview statement was different in some way from what he had told the police and from what he had testified to in court. Rhodes responded that he did not remember. Thereafter, on cross-examination, Rhodes testified that he had been in jail since his arrest in this case and had later entered into plea negotiations with the state. He testified that he had entered a plea of guilty to accessory to robbery in the second degree on October 25, 1983, but had not yet been sentenced at the time of the defendant's trial. On redirect examination, the state sought to introduce into evidence the statement of Rhodes that he had given to the Wethersfield police. Just prior to the offer of the statement, Rhodes testified that the plea agreement with the state had been entered into approximately one month before the trial and that that had been the first and only negotiation that had been conducted with the state. He further testified that there had not been a "deal or plea bargain"

in existence at the time he had given the statement to the Wethersfield police. Although the defendant objected to the introduction of the statement as an exhibit, he concedes in his brief that he "did not adequately raise and preserve the objection" to the introduction of the statement "at the time and may not claim it now." His specific claim on appeal, however, is that the court failed to instruct the jurors on the "temporal aspect of the prior consistent statement; that is, that such statement must be made prior to the time that a motive to fabricate existed."

The trial court instructed the jury, prior to the admission of the statement, that it was to be admitted only on the state's claim for the purpose of showing "consistency with [Rhodes'] present testimony," which occurs when the "other party attempts to show inconsistencies." The court instructed the jury at the close of all of the evidence that Rhodes' statement to the police was not admitted for "proof of matters stated therein but to affect the credibility of witnesses." The jury was also instructed that "[i]n considering whether Danny Rhodes should be believed because of prior inconsistent statements, you may also consider whether his prior consistent statement . . . given to the Wethersfield Police Department on January 13, 1983, [has] overcome the need for disbelief." The court explained to the jury that when "inconsistent statements are allowed to be admitted, the other party, the State in this case, is allowed to show that the witness has previously made statements consistent with his present testimony and particularly uninfluenced by any plea negotiations . . . ." See generally *State* v. *McCarthy,* 179 Conn. 1, 18, 425 A.2d 924 (1979).

Keeping in mind that the defendant does not challenge on appeal the admissibility of the statement, we need only determine whether the jury instructions were adequate. We conclude that the instructions were cor-

rect statements of the law and that they were sufficient to provide guidance to the jury in its consideration of this statement under the circumstances of this case. Cf. *State* v. *Anonymous (83-FG)*, 190 Conn. 715, 730, 463 A.2d 533 (1983); *State* v. *Brown*, 187 Conn. 602, 608–610, 447 A.2d 734 (1982). There is no error on this claim.

## VII

The defendant claims that the trial court erred in failing to instruct the jury on the "inherent unreliability" of accomplice testimony. After the charge to the jury, the defendant took an exception to the failure of the court to instruct the jury that it "should view the testimony of a co-accused with special wariness."

We have previously stated that "[t]he well settled rule in this state regarding the testimony of an accomplice is that 'where it is warranted by the evidence, it is the *court's duty* to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if he assisted or aided or abetted in the commission, of the offense with which the defendant is charged.' (Emphasis in original.) *State* v. *Ferrara*, 176 Conn. 508, 512, 408 A.2d 265 (1979); *State* v. *Colton*, 174 Conn. 135, 140, 384 A.2d 343 (1977)." *State* v. *Shindell*, 195 Conn. 128, 142, 486 A.2d 637 (1985). The court instructed the jury that it could consider the fact that Rhodes had been questioned "with respect to whether [his] testimony was motivated by hope or expectation of leniency on the part of the state for involvement in the events that have been portrayed by him." In that connection the court told the jury: "You will recall that he admitted that there were a great many charges filed against him including the theft of the camera, the robbery of Mrs. Johnson and conspiracy in that connection, criminal impersonation . . . ." The court further instructed the

jury that "the testimony of a witness who provides evidence against the defendant which is motivated by the hope or expectation of leniency must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether such witness' testimony has been affected by his interest or his motive to testify." The court brought to the jury's attention that Rhodes had entered into a plea agreement with the state in connection with these incidents, that his sentencing had been delayed until the conclusion of this case, and that some of his statements to the police appeared to be inconsistent with his present testimony. During its instructions, it also referred to Rhodes' statement that he was in jail "and would like to get out."

Our review of the defendant's requested jury instruction on the codefendant's testimony and the transcript of the jury charge leads us to conclude that the court substantially complied with the request. In this regard, we note that "a refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance." *Mazzucco* v. *Krall Coal & Oil Co.,* 172 Conn. 355, 357, 374 A.2d 1047 (1977); see *State* v. *Shindell,* supra, 143; *State* v. *Cooper,* 182 Conn. 207, 211, 438 A.2d 418 (1980). The charge is to be considered as a whole and "individual instructions are not to be judged in 'artificial isolation' from the overall charge. *State* v. *Reed,* 174 Conn. 287, 305, 386 A.2d 243 (1978); *State* v. *Holmquist,* 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977)." *State* v. *Estep,* 186 Conn. 648, 652, 443 A.2d 483 (1982). Moreover, the court's instructions adequately alerted the jury to examine Rhodes' testimony with care, especially with its development of his interest in obtaining what he viewed as consideration from the state for his testimony. While it would have been the better practice,

as we have indicated, to point out explicitly to the jury the special scrutiny to be given his testimony, the failure to do so in haec verba has not been shown to be harmful to the defendant. See, e.g., *State* v. *Estep,* supra, 652–53; *State* v. *Ruth,* 181 Conn. 187, 435 A.2d 3 (1980). The criteria to weigh Rhodes' interest and motivation in testifying as he did were sufficiently brought to the jury's attention by the instructions.

We conclude that the charge, read as a whole, provided the jury with sufficient warning and guidance in its consideration of Rhodes' testimony. There is no error.

## VIII

The defendant's final claim is that the trial court violated his constitutional rights to due process and to a fair and impartial jury by prohibiting voir dire questions concerning the potential jurors' attitudes towards civil rights issues. We note initially the record upon which we must review this claim. The voir dire of the potential jurors was not transcribed. A colloquy between the court and defense counsel on certain questions that he sought to ask has been transcribed. Three specific questions were set forth on the record but only one question that was prohibited by the trial court is at issue on this appeal.

The question that defense counsel sought to ask was as follows: "[D]o you believe that blacks have equal rights in the society with whites . . . ." Defense counsel claimed that the question was permissible because "a person's views and questions about anything related from the Ku Klux Klan to the—their views on civil rights and the voting rights, as to anything that might be current, are appropriate in cases where there's going to be a minority defendant and—well, in any case, where there's a minority defendant, respective [sic] of whether the witnesses are going to be of different racial

nature." The court responded that "[w]e are concerned with the venireman's prejudice, if any, not the opinion as to whether or not blacks in society have equal rights." Defense counsel then stated that "if [he were to] ask the question right out, are you prejudiced, almost no one in the world . . . is going to say he's prejudiced." He further stated that veniremen's racial views "will be based on how they view the rights of minorities, whether I ask about busing or whether I ask about voting or crime." Defense counsel then asked the trial court whether its objection to the question "was based on that one question or on that nature of the question" and the court stated that its objection went to the nature of the questions and the defendant noted an exception.

On appeal, the defendant claims that the trial court abused its discretion and that "merely asking jurors if they were racist would not offer an ample basis for discovering prejudice." We disagree.

The trial court has wide discretion in conducting the voir dire. *Ristaino* v. *Ross,* 424 U.S. 589, 594–95, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976); *State* v. *Dahlgren,* 200 Conn. 586, 601, 512 A.2d 906 (1986). The "extent to which parties may go in such an examination rests largely in the discretion of the court, and the exercise of that discretion will not constitute reversible error unless the discretion has been clearly abused and one of the parties has been prejudiced thereby." *State* v. *Higgs,* 143 Conn. 138, 142, 120 A.2d 152 (1956). In *State* v. *Higgs,* supra, 144, we held that "rulings excluding from the examination on the voir dire *all* questions concerning race prejudice were an abuse of the court's discretion." (Emphasis added.) That is not the circumstance of this case. We must then determine whether the trial court's limitation on the extent of the examination into "race prejudice" in this case was an abuse of discretion and a violation of his state and federal con-

stitutional rights. The record provided us to review this claim is hardly adequate, and it is the appellant's burden to furnish an adequate record. *State* v. *Tyler-Barcomb,* 197 Conn. 666, 676, 500 A.2d 1324 (1985); *State* v. *One 1977 Buick Automobile,* 196 Conn. 471, 480, 493 A.2d 874 (1985); *DeMilo* v. *West Haven,* 189 Conn. 671, 681, 458 A.2d 362 (1983). In this case, the nontranscription of the voir dire attenuates meaningful review because only those specific questions objected to were transcribed. Cf. *State* v. *Marsh,* 168 Conn. 520, 528, 362 A.2d 523 (1975). It is thus very difficult to assess whether it was error to exclude a specific question claimed as we do not know whether other questions touching on a similar area were in fact permitted. This assumes particular significance because the defendant does not appear on the record we have to claim that he was barred from making *any* inquiry regarding race on the voir dire of potential jurors.

In *Turner* v. *Murray,* 476 U.S. 28, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986), the United States Supreme Court has recently held that, in a capital case, a defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias but that, nevertheless, the trial court retains discretion as to the form and number of questions on the subject.[11] The defendant in this case was not charged with a capital crime and therefore the question becomes whether the federal constitutional right to an impartial jury has been violated.

---

[11] We additionally note that the court stated that the "mere fact that the defendant is black and his victim is white does not constitute a 'special circumstance' of constitutional proportions" and that absent that, "the Constitution leaves the conduct of *voir dire* to the sound discretion of state trial judges." *Turner* v. *Murray,* 476 U.S. 28, 38 n.12, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986); see *Ristaino* v. *Ross,* 424 U.S. 589, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976).

"The right to a voir dire examination of each prospective juror in a criminal action is provided by § 54-82f of the General Statutes. This right was established as a constitutional one in 1972 by inclusion in article IV of the amendments to the state constitution of the provision that '[t]he right to question each juror individually by counsel shall be inviolate.' See *State* v. *Haskins,* 188 Conn. 432, 446, 450 A.2d 828 (1982); *State* v. *Anthony,* 172 Conn. 172, 174, 374 A.2d 156 (1976)." *State* v. *Hill,* 196 Conn. 667, 671, 495 A.2d 699 (1985). "This right, however, is not unlimited." *State* v. *Marsh,* supra, 523. In *Marsh,* on the issue of whether the defendant's inquiry into racial prejudice on voir dire was significantly restrained, we stated "[c]ounsel is not entitled to ask questions on the subject of race prejudice in unlimited numbers or in any particular form, and the questions must not be irrelevant or vexatious." *State* v. *Marsh,* supra.

The general question sought to have been posed in this case, whether blacks have equal rights in society with whites, would not necessarily have revealed to counsel a potential juror's prejudice towards blacks. As the state points out in its brief, the question as phrased does not reveal whether a potential juror believes blacks *ought* to have equal rights with whites. Moreover, the vague recital of the "nature of the questions" he additionally sought to ask did not specifically focus on racial prejudice but rather on political issues with racial overtones. The trial court, from its statement that "we are concerned with the venireman's prejudice, if any," indicated it would not have precluded some inquiry into racial prejudice.

On the basis of this very limited record before us, we cannot say that the trial court abused its discretion in prohibiting the defendant from asking the specific question or the "nature" of the questions involved in this case.

The case is remanded for modification of the judgment in accordance with this opinion and for resentencing on the lesser included offense of accessory to robbery in the third degree.

In this opinion the other justices concurred.