STATE OF CONNECTICUT *v.* HERBERT L. JACKSON
(AC 22150)

Dranginis, Flynn and Bishop, Js.

Argued November 22, 2002—officially released March 18, 2003

[11] Although irrelevant as a matter of law, the plaintiffs knew of the alleged omission by September 20, 1992.

*Alison R. Lanoue*, with whom, on the brief, was *William A. Snider*, for the appellant (defendant).

*Elizabeth Bodine*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Christopher A. Alexy*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Herbert L. Jackson, appeals from the judgment of conviction, rendered after a jury trial, of aggravated sexual assault in the first degree in violation of General Statutes § 53a-70a (a) (4),[1] conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 (a)[2] and 53a-

---

[1] General Statutes § 53a-70a (a) provides in relevant part: "A person is guilty of aggravated sexual assault in the first degree when such person commits sexual assault in the first degree as provided in section 53a-70, and in the commission of such offense . . . (4) such person is aided by two or more other persons actually present. . . ."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

101,[3] and conspiracy to commit robbery in the second degree in violation of General Statutes §§ 53a-48 (a) and 53a-135.[4] On appeal, the defendant claims that the trial court improperly (1) denied his motion for a judgment of acquittal because there was insufficient evidence to sustain the jury's verdict and (2) instructed the jury regarding the law on consciousness of guilt. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. During the first week of January, 1996, the victims J, V and V's one year old son moved into a new apartment.[5] Snow had fallen that day and the streets were slippery with ice, causing their rented moving truck to get stuck in the snow. Thereafter, the two women went across the street to a convenience store to get help unloading their heavy pieces of furniture from the truck. A store clerk offered to drive them to a nearby community center to get the defendant, who was the clerk's brother, to help move the furniture. Shortly thereafter, the defendant and his cousin, who also had agreed to help, began moving the furniture. As the snowfall increased, they stopped moving the furniture, and the defendant drove the women to their former apartment. A few minutes later, the defendant returned and explained that his car was stuck in the snow and asked

[3] General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

[4] General Statutes § 53a-135 (a) provides in relevant part: "A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and . . . (2) in the course of the commission of the crime or of immediate flight therefrom he or another participant in the crime displays or threatens the use of what he represents by his words or conduct to be a deadly weapon or a dangerous instrument."

[5] In accordance with our policy to protect the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom the victims' identity may be revealed. See General Statutes § 54-86e.

the victims if he could use their telephone to call for assistance. After using the telephone, the defendant asked J if he could have her puppy as payment for moving the furniture. She told the defendant no, but that she would get him another dog from the same litter. The following day, J left the apartment and returned to discovered that the puppy was missing. She then went to the convenience store and asked the clerk to tell the defendant that she wanted him to return the dog.

On January 8, 1996, J and V, who were then sixteen and eighteen years old, respectively, invited a female friend, M, and two males, R, who is V's cousin, and T, to their apartment to socialize. At some point, J, M and R got hungry and decided to go across the street to a McDonald's restaurant to get something to eat. After the three left, the defendant appeared at the victims' apartment to confront J about her accusations that he had stolen the puppy. While V and the defendant talked in the doorway, two men wearing masks, at least one of whom was armed with a gun, came up behind the defendant and forcibly pushed him forward into the apartment. Once inside, the masked men announced that it was a robbery and ordered V, her son, the defendant and T into the kitchen and to lie on the floor, where V and T were searched and robbed of their belongings. The two men then told V to take her clothes off. When she began to cry, one of the masked men hit her in the face with the handgun.

Ten minutes later, J, M and R returned to the apartment. When J knocked on the apartment door, someone inside unlocked it and, as she opened the door, one of the masked men held a gun to her face. At trial, M testified that as she walked into the apartment, she saw V crying while sitting on the kitchen floor with her pants around her ankles. At that point, the taller of the masked men forced the three to lie on the floor. Shortly

thereafter, he ordered J and M to go into the child's bedroom.

After ordering J and M to remove their clothes, the taller masked man forced them at gunpoint to perform cunnilingus on one another while he watched. J testified that at some point, the defendant walked into the bedroom and took off his jacket. He then got on his knees, and the masked man ordered J to perform fellatio on the defendant. After J tried to bite the defendant's penis, the defendant yelled at her to stop and to "suck it right." The defendant then pushed J onto her back and, without being told to do so by the masked man, engaged in vaginal intercourse with her. At trial, J and M testified that just before the sexual assault, the masked man told the defendant to "f–k her like she's never been f–ked before." During the sexual assault, the masked man ordered M to lick the defendant's buttocks. The masked man then turned off the lights and left the bedroom, leaving M, J and the defendant in the room alone for ten minutes. Before the defendant ejaculated in J, he told her to look at his face and asked her if she wanted him to come back later that evening. T then was called into the bedroom, and the masked man grabbed him on the back of the neck and demanded that he perform cunnilingus on J and M.

Shortly thereafter, the two masked men put everyone except the defendant in the bedroom, told them to count to 100 and warned them that if they reported the incident to the police they would be killed. While the victims and their friends were waiting for the masked men and the defendant to leave, they could hear the men rummaging through the apartment as they ransacked it. The evidence established that the defendant and the others fled the scene together. A while later, the victims left the bedroom and discovered that the telephone had been ripped out of the wall. V then called the police from a neighbor's apartment. The police arrived shortly

thereafter and took J and M to a hospital, where a physician examined them and a rape counselor interviewed them.

The evidence also established that when the defendant arrived home, he neither called the police nor did he return to the victims' apartment. Later that evening, at approximately 11 p.m., Detectives William Piascyk and Ariel Melendez interviewed the defendant in his home about the burglary, robbery and sexual assault. During their questioning, the defendant received several telephone calls from someone expressing concern about the police being at the defendant's home. The detectives eventually asked the defendant's father to answer the telephone. The defendant initially denied any involvement, but later stated that he had been forced to commit the sexual assault and identified his cousin, Melvin Flowers, and uncle, Steve Harrington, as those who were involved.[6] The following day, the defendant went to the police station where he gave a voluntary statement.

In April, 1996, the defendant was arrested and charged in a three count substitute information with aggravated sexual assault in the first degree, conspiracy to commit burglary in the first degree and conspiracy to commit robbery in the second degree. The jury found him guilty as charged on all three counts. At the sentencing hearing, the court merged the conviction on the conspiracy charges and imposed a fifteen year sentence of imprisonment on them. In addition, the defendant was sentenced to twenty years imprisonment on the aggravated sexual assault count, to run consecutively to the conspiracy sentence, for a total effective sentence of thirty-five years imprisonment. The defendant's subsequent motions for a judgment of acquittal as to both

---

[6] At trial, the defendant claimed that he gave the two names only after the detectives questioned him about who kept calling him.

charges and for a new trial were denied. This appeal followed.

## I

The defendant first claims that the court improperly denied his motion for a judgment of acquittal because there was insufficient evidence to sustain his conviction. We disagree.

Preliminarily, we note that "[t]he standard of appellate review of a denial of a motion for a judgment of acquittal [challenging the sufficiency of the evidence] has been settled by judicial decision. . . . The issue to be determined is whether the jury could have reasonably concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt. . . . The facts and the reasonable inferences stemming from the facts must be given a construction most favorable to sustaining the jury's verdict. . . .

"[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . It is uniquely the province of the trier of fact, in this case the jury, to determine the import of the evidence by gauging the credibility of the witnesses. . . . The fact that certain testimony is uncorroborated, or even contradicted, does not make it insufficient to support a verdict if the

testimony is believed by the trier." (Citations omitted; internal quotation marks omitted.) *State* v. *Arceniega*, 73 Conn. App. 288, 293–94, 807 A.2d 1028 (2002).

A

We first turn to the defendant's argument that the evidence presented at trial was insufficient to support his conviction for aggravated sexual assault in the first degree. In support of his argument, the defendant contends that the state could not prove its charge beyond a reasonable doubt because the masked man in the kitchen did not do anything to aid the defendant in the sexual assault of J nor was that masked man actually present during that assault. We are unpersuaded.

To convict the defendant of aggravated sexual assault in the first degree under § 53a-70a (a) (4), the state must prove beyond a reasonable doubt that the defendant was "aided by two or more other persons actually present." The defendant concedes that one of the masked men directed the sexual activity between him and J, but argues that the state offered no proof that the masked man in the kitchen did anything to aid the defendant in the sexual assault of J. Without more, the defendant argues, the state has proven only that one person aided him in the sexual assault. The defendant further argues that because the phrase "actually present" is not defined in § 53a-70a, its ordinary meaning clearly conveys that because one of the masked men was in another room, he could not be "actually present" during the sexual assault of J.

The defendant correctly points out that we have not previously addressed what constitutes "actually present" for the purposes of § 53a-70a (a) (4). In construing the meaning of terms in a statute, words "must be given their plain and ordinary meaning . . . unless the context indicates that a different meaning was intended. . . . Where a statute does not define a term

it is appropriate to look to the common understanding expressed in the law and in dictionaries." (Citation omitted; internal quotation marks omitted.) *State* v. *Vickers*, 260 Conn. 219, 224, 796 A.2d 502 (2002).

Here, case law directs us to the ordinary meaning of "actually present." In *State* v. *Edwards*, 201 Conn. 125, 513 A.2d 669 (1986), our Supreme Court explained that in the context of accomplice liability, the victim's sensory perception by observation, feeling or belief is sufficient to show that the accomplice was "actually present" during the commission of the robbery. Id., 133. The defendant in *Edwards* was charged with one count of robbery in the second degree as an accessory in violation of "§ 53a-135 (a) (1) [which] requires that the person who commits the robbery be 'aided by another person actually present.' " Id., 132. Our Supreme Court concluded that the defendant, as the driver of the getaway car, was not 'actually present' during the robbery because the victim was not aware of the defendant until after the commission of the robbery. Id., 134–35. Although we acknowledge that *Edwards* is instructive on the interpretation of "actually present," we conclude that it is distinguishable from the facts of the present case.

The facts here indicate that J was aware of the presence of the two masked and armed men in her apartment during the robbery and sexual assault. Furthermore, the masked man in the kitchen was more than merely present innocently at the crime scene; he aided the defendant by holding the other victims at bay.[7] In addition, the other victims were restrained from

---

[7] Our Supreme Court has further explained that it is not necessary to prove that an accused was actually present at or actively involved in the actual commission of a crime to sustain a conviction under the accessory statute, General Statutes § 53a-8. Proof that the accused intentionally assisted in the commission of the crime is sufficient. See *State* v. *Haddad*, 189 Conn. 383, 400, 456 A.2d 316 (1983); see also *State* v. *Edwards*, supra, 201 Conn. 135, citing *State* v. *Miller*, 14 Or. App. 608, 513 P.2d 1199, 1201 (1973), for the proposition that the element of "actually present" was proven

preventing the sexual assault from occurring and from calling for the emergency assistance of the police.

In the circumstances of this case, we therefore conclude that it is the victim's objective and subjective awareness, and not the physical proximity of the perpetrator in the room where the sexual assault took place, as the defendant suggests, that controls the factual determination that the masked man in the kitchen was "actually present" during the sexual assault and that his use of force against J and her friends in the apartment contributed to her victimization.

From the cumulative effect of the evidence and the reasonable inferences drawn therefrom, we conclude that the jury reasonably could have found that the defendant was guilty of aggravated sexual assault in the first degree. Accordingly, the court properly denied the defendant's posttrial motion for a judgment of acquittal.

B

Next, the defendant claims that the evidence adduced at trial was insufficient to support his conviction of conspiracy to commit burglary in the first degree or conspiracy to commit robbery in the second degree because the evidence failed to show that he entered into an agreement with the two masked men. The evidence indicates otherwise.

The standard of review set forth in part I A applies as well to this claim. Initially, we note that to convict the defendant of the crime of conspiracy to commit burglary in the first degree and conspiracy to commit robbery in the second degree, the state must establish that a conspiracy existed. "To establish the crime of conspiracy [to commit burglary and robbery . . . the

---

when the defendant was aided by another person "standing in the parking lot twenty-five feet from the victim whom she observed *during the course of the attack*." (Emphasis in original.)

state must show] that an agreement was made between two or more persons to engage in conduct constituting [the crimes of burglary and robbery] and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . While the state must prove an agreement [to commit burglary and robbery], the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons." (Internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 669, 804 A.2d 810 (2002).

Viewed in the light most favorable to sustaining the verdict, the record clearly establishes that the defendant entered into an agreement with the two masked men for the purpose of burglarizing the victims' apartment, and robbing them and their friends of any cash or jewelry they had in their possession. The jury reasonably could have inferred from the evidence that the defendant and the masked men concocted a ruse to gain entry into the victims' apartment, whereby the defendant pretended to go to the apartment to talk to J about her accusations that he had stolen her dog. Furthermore, V testified that the defendant warned the two masked men when J and her friends returned home from the McDonald's restaurant. The jury also heard testimony that the masked men ordered everyone but the defendant into the bedroom. Moreover, the defendant testified that when the masked men left the apartment, they somehow knew that the defendant had

parked his car across the street from the victims' apartment. Although the defendant gave testimony that contradicted the witnesses' testimony, including his statements that he was forced to participate in the sexual assault and that he did not form a plan with the two masked men, it was within the jury's province to believe or disbelieve any testimony, and to weigh conflicting evidence and to determine the credibility of the witnesses. See *State* v. *Colon*, 71 Conn. App. 217, 225, 800 A.2d 1268, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002).

Accordingly, we conclude that there was sufficient evidence to establish that an agreement between the defendant and the two masked men existed. The court did not improperly deny the defendant's motion for a judgment of acquittal.

## II

The defendant's final claim is that the court gave an incomplete instruction to the jury regarding the law on consciousness of guilt. Specifically, the defendant argues that the court improperly failed to remind the jury that he provided an innocent explanation for his evasive conduct. He further argues that the court's jury instructions should have included an explanation that innocent people may have feelings of guilt. Therefore, he claims that the court's omission made it reasonably possible that the jury was misled. We disagree.

In reviewing the defendant's claim, we adhere to the well settled rule that "[a] jury instruction must be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law.

. . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . While the instructions need not be exhaustive, perfect or technically accurate, they must be correct in law, adapted to the issues and sufficient for the guidance of the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *William C.*, 71 Conn. App. 47, 83, 801 A.2d 823, cert. granted on other grounds, 262 Conn. 907, 810 A.2d 277 (2002).

We are also mindful that "[t]he decision whether to give an instruction on flight, as well as the content of such an instruction, if given, should be left to the sound discretion of the trial court." *State* v. *Hines*, 243 Conn. 796, 816, 709 A.2d 522 (1998).

The defendant acknowledges in his brief that challenges concerning his proposed instruction have been rejected by this court and by our Supreme Court. He asks us, nevertheless, to reconsider previous decisions that have rejected challenges similar to the one that he has raised. See *State* v. *Wright*, 198 Conn. 273, 281, 502 A.2d 911 (1986); *State* v. *Watts*, 71 Conn. App. 27, 35, 800 A.2d 619 (2002); *State* v. *Holmes*, 64 Conn. App. 80, 88, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001). We decline the defendant's invitation to depart from well established precedent.

Accordingly, because the defendant's request to charge was an inaccurate statement of the applicable law and because the court's jury instructions, taken as a whole, were correct in law, we conclude that the court properly refused to give the excluded portion of the defendant's requested charge.

The judgment is affirmed.

In this opinion the other judges concurred.