### STATE OF CONNECTICUT *v.* WILLIAM B.[1]
### (AC 21592)

Schaller, Bishop and West, Js.

---

Argued December 11, 2002—officially released May 20, 2003

*Kent Drager*, senior assistant public defender, with whom, on the brief, were *Al Cali* and *Domenic Costello*, certified legal interns, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Brian Preleski*, assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, William B., appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and two counts of risk of injury to a child in violation of General Statutes § 53-21. On appeal, the defendant claims that the trial court improperly (1) admitted the testimony of two licensed marriage and family therapists pursuant to the medical diagnosis and treatment exception to the hearsay rule, (2) refused to admit into evidence correspondence to the defendant from the victim's half-sister, (3) denied

defense counsel's motion to withdraw, (4) denied the defendant's motion to recuse, (5) denied his motion for a judgment of acquittal on counts two, three and five of the information, and (6) denied him access to the victim's Juvenile Court records concerning neglect proceedings. He also claims (7) that the state violated his constitutional right against double jeopardy. We reverse the defendant's conviction of sexual assault in the second degree and affirm the judgment of the trial court in all other respects.

The jury reasonably could have found the following facts.[2] The defendant is the victim's father. From the time she was born in 1982 until 1993, the victim lived with the defendant, her mother and her half-sister in the town of B.[3] In 1993, when her parents separated, the victim resided with the defendant in the town of S until she was removed from his care in late 1994 or early 1995. Prior to the separation, the victim's half-sister saw the defendant perform cunnilingus on the victim and witnessed the victim perform fellatio on the defendant. Those acts occurred two or three times a week when the victim's mother was not at home. The victim was not a willing participant in that sexual activity, and the defendant gave her money, candy or cigarettes so that she would not tell anyone.

Subsequent to the defendant's divorce from his wife, a male acquaintance of the defendant visited him and the victim in their home in the town of S. He participated in a game invented by the defendant called "naked hide-and-seek." The defendant's game was played by turning out the lights and hiding. The person who was found

---

[2] The victim did not testify at trial. The state called the victim as the first witness, but she was unable to complete her testimony, and the court ordered her brief testimony stricken and instructed the jury to disregard it.

[3] The victim was born on September 5, 1982. Trial commenced on September 20, 2000. This court takes judicial notice that the victim was eighteen at the time of trial.

had to remove an article of clothing. The game ended when everyone was naked. The defendant encouraged his acquaintance to touch the victim sexually. According to the acquaintance, he subsequently was convicted of sexual assault in the first degree for acts he perpetrated on the victim when he was with the defendant and the victim.

During the time the victim was living with the defendant in the town of S, the victim's school friends visited their home every day. In 1994, one of the school friends observed the defendant make frequent sexual gestures and comments to the victim. She saw the defendant gesture with his tongue as if performing oral sex and saw him touch the victim's buttocks. She was present when the defendant dared the victim to remove her shirt in front of him, which the victim did. On one occasion, the defendant pretended to go into the shower, but instead jumped naked in front of the school friend, the victim and another girl. Sometime in late 1994, the victim's school friend told her mother, and then the police, what she had observed. The police conducted an investigation as a result of the school friend's report. Shortly after the school friend made her report, the victim was removed from the defendant's care by agents of the department of children and families, who instituted neglect proceedings against the defendant.

In May, 1998, agents of the department of children and families referred the victim to the Children's Home of Cromwell (home), a residential treatment center for children who have encountered severe emotional abuse and are in need of therapy. The victim was placed in the home as a result of her self-injurious behavior, suicidal ideation, aggressiveness, obsession with death and dying, and attempted suicide. During the course of her treatment at the home, the victim revealed to her therapists that the defendant had sexually abused her.

In April, 1999, Michael Shanley, a police detective, interviewed the defendant about the victim's allegations of sexual abuse. In response to questions as to whether he had had sexual relations with his daughter, the defendant responded, "I don't remember." The defendant was arrested soon thereafter and charged with the crimes of which he has been convicted.

The defendant was tried pursuant to a substitute long form information dated September 18, 2000. The five counts of the information alleged in part as follows: In count one, that at the town of B on divers dates between 1990 and 1994, as a continuing course of conduct, the defendant engaged in sexual intercourse with the victim, who was younger than thirteen, in violation of § 53a-70 (a) (2); in count two, that at the town of S on divers dates between 1994 and September 4, 1995, as a continuing course of conduct, the defendant engaged in sexual intercourse with the victim, who was younger than thirteen, in violation of § 53a-70 (a) (2); in count three, that at the town of S on divers dates between September 5, 1995, and 1996, as a continuing course of conduct, the defendant engaged in sexual intercourse with the victim, who was thirteen years of age or older but younger than sixteen years of age, in violation of § 53a-71 (a) (1); in count four, that at the town of B on divers dates between 1990 and 1994, as a continuing course of conduct, the defendant did an act likely to impair the health or morals of the victim, a child younger than the age of sixteen years, in violation of § 53-21; and in count five, that at the town of S on divers dates between 1994 and 1996, as a continuing course of conduct, the defendant did an act likely to impair the health or morals of the victim, a child younger than the age of sixteen years, in violation of § 53-21.

Following the jury's verdict, the court sentenced the defendant to forty years in prison. This appeal followed.

## I

The defendant's first claim is that the court improperly admitted the testimony of two licensed marriage and family therapists under the medical treatment and diagnosis exception to the hearsay rule. We disagree.

The following facts are relevant to our resolution of the defendant's claim. At trial, the prosecutor stated his intention to call two employees of the home, Tony Gibson and Asha Patlikh, state licensed marriage and family therapists, who treated the victim at the home. The prosecutor represented that the therapists would testify that during her course of treatment at the home, the victim disclosed the defendant's sexual abuse. The defendant objected to the admission of their testimony, claiming that there was no indication that the victim was at the home for medical treatment or why she was being treated.

The prosecutor proffered further that the therapists would testify as to their qualifications, that they had treated the victim and that during the course of their treatment, she revealed that the defendant had sexually abused her from the time she was four until she was eleven, and described the different acts of sexual favors that he asked of her and the game "naked hide-and-seek." Furthermore, the prosecutor proffered that the victim first made the disclosures in August, 1998, during the course of her treatment at the home and that the therapists relied on those statements to provide her with mental health care and treatment.

In addition, during the hearing on the defendant's objection to the therapists' being permitted to testify, Gibson testified that children who are admitted to the home have been given a psychiatric diagnosis. He also testified that the victim was being treated at the home to help her address the issues that had brought her

there.[4] The court overruled the defendant's objection,

---

[4] During the court's hearing on the defendant's objection, Gibson testified, in part, in response to questions from the prosecutor, as follows:

"[Prosecutor]: Did you have occasion to treat [the victim]?

"[The Witness]: Yes, I did.

"[Prosecutor]: And what was the purpose of that treatment, sir?

"[The Witness]: To help her therapeutically work through the issues that brought her into our facility.

"[Prosecutor]: And would you consider that falling under the ambit of mental health care?

"[The Witness]: Yes, I would.

"[Prosecutor]: And with respect to that treatment, does that treatment consist in part of your patient describing events to you?

"[The Witness]: Yes, it does.

"[Prosecutor]: And are those descriptions of events pertinent to your treatment?

"[The Witness]: Yes, it is.

"[Prosecutor]: And with respect to the events that you describe in your report and that I outlined yesterday when you were here in court concerning, specifically [the victim's] description of what her father did to her, was that pertinent to your treatment?

"[The Witness]: Yes, it was."

In response to questions from defense counsel, Gibson testified, in part, as follows:

"[Defense Counsel]: Well, how did she come to your facility? Well, first of all, what is your facility?

"[The Witness]: It's the Children's Home of Cromwell.

"[Defense Counsel]: Children's Home of Cromwell, and you treat, not treat, but house children?

"[The Witness]: We therapeutically treat children.

"[Defense Counsel]: Why was she there? Who placed her there and under what conditions did they place her there?

"[The Witness]: She was placed there by the department of children and families to be treated at our facility for therapeutic reasons.

"[Defense Counsel]: Okay. Did they give you a list of what the therapeutic reasons were?

"[The Witness]: Yes.

"[Defense Counsel]: They had a specific designation as to what treatment she was to receive?

"[The Witness]: They give us referral material. Yes.

"[Defense Counsel]: You say referral material.

"[The Witness]: With goals and objectives."

Gibson further testified, in part, in response to questions from the prosecutor as follows:

and permitted the therapists to testify under the medical diagnosis and treatment exception to the hearsay rule. See Conn. Code Evid. § 8-3 (5).[5]

On appeal, the defendant claims that the court improperly admitted the testimony of the therapists because (1) they are not medical professionals and were not acting in the chain of medical treatment of the victim, (2) the victim's statements were not made for the purpose of seeking medical treatment and (3) the identity of the alleged perpetrator was not relevant to the purported treatment of the victim because she had been removed from the defendant's home several years before she made the accusations. The defendant claims that not only did the court improperly admit the evidence, but it also denied him his constitutional right to confrontation. None of the defendant's claims with

"[Prosecutor]: Now, in the course of your treatment of [the victim] did she make certain statements to you concerning her father?

"[The Witness]: Yes, she did. . . .

"[Prosecutor]: Did you rely on those statements?

"[The Witness]: I don't understand?

"[Prosecutor]: In connection with your therapy, are those statements that you relied upon?

"[The Witness]: Yes, I did.

"[Prosecutor]: And what did she tell you that her father did?

"[The Witness]: She described to me various things that her father asked her to do, sexual favors, playing games. She described that these happened over a period of a long time, from ages four to eleven.

"[Prosecutor]: And what were the nature of the games that she described?

"[The Witness]: She described to me in particular playing hide-and-seek and she would have to hide. When she was found, she would have to get undressed, and then she would have to perform sexual favors.

"[Prosecutor]: And what were the nature of the sexual favors she described?

"[The Witness]: She described oral sex, rubbing different body parts, being rubbed, having to lick him and vice versa."

[5] Connecticut Code of Evidence § 8-3 (5) provides: "A statement made for purposes of obtaining medical treatment or advice pertaining thereto and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical treatment or advice."

respect to the testimony of the victim's therapists is meritorious.

"It is well settled that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . [Its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make *every reasonable presumption* in favor of upholding the trial court's ruling, and only upset it for a *manifest abuse of discretion.* . . . Moreover, evidentiary ruling will be overturned on appeal only where there was . . . a showing by the defendant of substantial prejudice or injustice. . . . [T]he defendant . . . must show that it is more probable than not that the erroneous action of the court affected the result." (Emphasis in original; internal quotation marks omitted.) *State* v. *Padua,* 73 Conn. App. 386, 425–26, 808 A.2d 361 (2002), cert. granted on other grounds, 262 Conn. 941, 815 A.2d 672 (2003).

"It is well settled that out-of-court statements made by a patient to a physician for the purposes of obtaining medical diagnosis and treatment are admissible under the treating physician exception to the hearsay rule. See, e.g., *State* v. *DePastino,* 228 Conn. 552, 565, 638 A.2d 578 (1994). Out-of-court statements made by a patient to a physician may be admitted into evidence if the declarant was seeking medical diagnosis or treatment, and the statements are reasonably pertinent to achieving those ends. Id." (Internal quotation marks omitted.) *State* v. *Kelly,* 256 Conn. 23, 44, 770 A.2d 908 (2001).

"[S]tatements concerning the cause of the injury or the identity of the person who caused the injury usually are not relevant to treatment and, therefore, are not admissible under the medical diagnosis and treatment

exception to the hearsay rule." (Internal quotation marks omitted.) Id., 45. Our Supreme Court, however, has concluded "that testimony pertaining to the identity of the defendant and the nature of sexual assault were wholly relevant and pertinent to proper diagnosis and treatment of the resulting physical and *psychological injuries of sexual assault.*" (Emphasis added.) Id. "In any sexual assault, the identity of the perpetrator undoubtedly is relevant to the physician to facilitate the treatment of *psychological* and physical injuries." (Emphasis added; internal quotation marks omitted.) Id.; see also *State* v. *Cruz*, 260 Conn. 1, 14–15, 792 A.2d 823 (2002); *State* v. *Martin*, 38 Conn. App. 731, 740, 663 A.2d 1078 (1995) (if sexual abuser is member of child victim's household, it is reasonable for physician to ascertain identity of abuser to facilitate treatment of psychological injuries), cert. denied, 237 Conn. 921, 676 A.2d 1376, cert. denied, 519 U.S. 1044, 117 S. Ct. 617, 136 L. Ed. 2d 541 (1996).

"The rationale for excluding from the hearsay rule statements that a patient makes to a physician in furtherance of obtaining medical treatment applies with equal force to such statements made to other individuals within the chain of medical care. In each case, we presume that such statements are inherently reliable because the patient has an incentive to tell the truth in order to obtain a proper medical diagnosis and treatment. See, e.g., 2 C. McCormick, [Evidence (5th Ed. 1999)] § 277, p. 233." *State* v. *Cruz*, supra, 260 Conn. 10. In *Cruz*, our Supreme Court held "that statements made by a sexual assault victim to a social worker who is acting within the chain of medical care may be admissible under the medical treatment exception to the hearsay rule." Id. In view of the holding in *Cruz*, we see no reason why statements made by a sexual assault victim to a state licensed marriage and family therapist within the chain of medical care should not

also be admissible under the medical treatment exception to the hearsay rule.

In this instance, both Gibson and Patlikh testified that the victim was referred to the home for self-injurious behavior, including suicidal ideation and attempted suicide.[6] The home specialized in treating children who had been abused, and the victim received treatment at the home. Gibson was the clinical coordinator of the treatment the victim was receiving, and he also provided treatment to the victim. Patlikh testified that members of the staff at the home work as a treatment team and that a member of the team is a psychiatrist.[7]

Under the facts of this case, where the victim had harmed herself and was referred to the home for treatment pursuant to a psychiatric diagnosis, the treatment was administered by a team of mental health professionals that included a psychiatrist, we conclude that the victim's therapists were within the chain of medical care and treatment. The victim's statements to Patlikh and Gibson during the course of her treatment, therefore, fall within the medical diagnosis and treatment exception to the hearsay rule.

As to the defendant's claim that because the victim was referred to the home by agents of the department of children and families and that she herself did not seek medical care and treatment, we note that at the time she was admitted to the home, the victim was fifteen years old and, thus, a minor. As a rule, minors may not engage medical treatment for themselves without the permission of a parent or guardian. A review

---

[6] According to Patlikh, the victim had cut her hands.

[7] Patlikh testified, in part, on cross-examination as follows:

"[The Witness]: We work as a treatment team, and one of those people is a psychiatrist.

"[Defense Counsel]: And who was that?

"[The Witness]: When [the victim] first came, it was Dr. Gill Landy . . . and then it was Dr. Brian Keys. Both of them are psychiatrists."

of our case law demonstrates that in cases in which the statements of minor sexual assault victims to their health care providers were determined to be admissible, the children themselves did not seek out medical care, but were taken for treatment by their parent or guardian. See *State* v. *Cruz*, supra, 260 Conn. 10 (victim taken to hospital by mother for treatment); *State* v. *DePastino*, supra, 228 Conn. 555 (victim taken to hospital by grandmother); *State* v. *Maldonado*, 13 Conn. App. 368, 369, 536 A.2d 600 (victim taken to hospital by defendant), cert. denied, 207 Conn. 808, 541 A.2d 1239 (1988). We see no distinction between a parent or guardian taking a child for psychological treatment, and agents of the department of children and families referring a minor for such treatment. Furthermore, according to Patlikh, although the victim had been referred for treatment, she voluntarily accepted the treatment services of the home.

Contrary to the defendant's argument, it is significant that agents of the department of children and families, a state agency, had referred the victim to the home, a facility specializing in the psychological care and treatment of abused children. It would appear that if the victim was not being *treated* for her psychological problems, there was no reason for her to be at the home. The victim was exhibiting extreme emotional and psychological distress, having gone so far as to have caused physical harm to herself. It was during the course of her treatment at the home that the victim disclosed the defendant's sexual abuse to her therapists. It is not uncommon for patients at the home to wait to reveal important information until they had become adjusted to the new surroundings and reached a level of comfort and trust in the professionals with whom they are treating. Obviously, when the victim felt comfortable with her therapists, she revealed the defendant's acts of sexual abuse.

With respect to the defendant's third evidentiary claim, i.e., that the identity of the perpetrator of sexual assault on the victim was not relevant because she had been removed from the defendant's home prior to the time she revealed his sexual assault, the case law is to the contrary. The identity of the perpetrator of sexual assault is relevant to the treatment of psychological injuries resulting from sexual assault. See *State* v. *Cruz*, supra, 260 Conn. 14–15; *State* v. *Kelly*, supra, 256 Conn. 45. "[I]n cases of sexual abuse in the home, hearsay statements made in the course of medical treatment which reveal the identity of the abuser are reasonably pertinent to treatment and are admissible." (Internal quotation marks omitted.) *State* v. *DePastino*, supra, 228 Conn. 565.

Under the facts of this case, where a state agency referred the victim, who had a psychiatric diagnosis, to a facility specializing in the care and treatment of abused children that is administered by therapists and psychiatrists working as a team, there is no violation of the medical exception to the hearsay rule. Compare *State* v. *Gonzalez*, 75 Conn. App. 364, 376–77, 815 A.2d 1261 (2003) (statement not made for purposes of medical treatment); *State* v. *Cruz*, 56 Conn. App. 763, 770, 746 A.2d 196 (2000) (victim thought she was talking to a physician), aff'd, 260 Conn. 1, 792 A.2d 823 (2002).

We turn now to the defendant's constitutional claim that by improperly admitting the hearsay testimony of the victim's therapists, the court denied him the right to confrontation. Without legal analysis of the facts of this case, the defendant cites *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), for the proposition that evidence that does not fall within a firmly rooted hearsay exception is inadmissible under the confrontation clause absent a showing of particularized guarantees of trustworthiness. We think that this is an accurate statement of the law; however, we have

concluded that the court properly admitted the therapists' testimony under the medical exception to the hearsay rule. The defendant's right to confrontation, therefore, was not denied.

In summary, the court properly admitted the testimony of the victim's therapists.

## II

The defendant claims that the court improperly limited his cross-examination of the victim's half-sister by prohibiting him from admitting into evidence photocopies of letters she had sent to the defendant. The defendant further claims that the content of the letters evince an attitude of the half-sister toward him that is inconsistent with her testimony that she was fearful of him. We conclude that the court properly refused to admit the letters into evidence.

The following facts are relevant to the defendant's claim. In addition to testifying about the acts of sexual abuse the defendant committed on the victim that she had observed, the victim's half-sister also testified that the defendant was an abusive person who had struck her and the victim, and threw things in the family home.[8] The victim and her half-sister did not tell anyone of the defendant's abusive behavior because they were frightened of him.

During cross-examination, the defendant sought to impeach the credibility of the half-sister regarding her relationship with the defendant by introducing photocopies of letters she wrote to the defendant between 1995 and 1997. The defendant sought to demonstrate that the victim's half-sister continued to maintain a positive and loving relationship with the defendant, an attitude that was inconsistent with her testimony that he

---

[8] The half-sister lived with the defendant, her mother and the victim only until the time of the divorce in 1993.

had abused the victim and that the half-sister was afraid of him. The prosecutor objected on the ground that the content of the letters was irrelevant as to impeachment. The victim's half-sister admitted that she had visited the defendant after her mother divorced him and that she had written letters to him a few times while she was living with her boyfriend and later her husband in New York state. The court agreed with the prosecutor.

On appeal, the defendant claims that the court restricted his cross-examination of the victim's half-sister in violation of his constitutional right. "[T]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . This right, however, is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The trial court, in its discretion, may impose limitations on the scope of cross-examination, as long as the defendant has been permitted sufficient cross-examination to satisfy constitutional requirements. . . . The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited and the right to cross-examine is subject to the duty of the court to exclude irrelevant evidence." (Internal quotation marks omitted.) *State* v. *Henry*, 72 Conn. App. 640, 665, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002).

The victim's half-sister provided relevant eyewitness testimony that she saw the defendant perform cunnilingus on the victim and the victim perform fellatio on him. That testimony was relevant to the charges against the defendant. The half-sister also testified that she was afraid of the defendant while she lived with him because

he hit her and the victim and threw things. On cross-examination, the half-sister admitted that she had visited the defendant after he had separated from her mother, but she was not concerned for her personal safety because her boyfriend was with her during those visits. She also sent letters, including a Christmas card, to the defendant from New York state, sometimes addressing the envelope "William, Dad, B . . ."

On the basis of our review of the record, we conclude that the court did not infringe on the defendant's right to cross-examine or to impeach the credibility of the victim's half-sister. The witness admitted that she had visited the defendant after he separated from her mother, but provided a credible explanation of why she did not fear him then. The content of the letters was irrelevant to the sexual abuse about which she testified and, as the court pointed out, the letters were written a number of years after she had stopped living with the defendant. Moreover, it is not the content of the letters that was relevant, but the fact that the half-sister continued to see and to communicate with the defendant after he had separated from her mother that was germane to her relationship with him. Those facts were before the jury for its consideration, and the court, therefore, did not unfairly restrict the defendant's right to impeach the credibility of the victim's half-sister on cross-examination.

### III

The defendant claims the court, *Wollenberg, J.*, improperly denied the pretrial motion to withdraw filed by defense counsel.[9] We do not agree.

---

[9] The defendant also filed a letter asking that his counsel be replaced. He wanted the court to supply him with counsel. At about that time, the defendant qualified for the assistance of a public defender in a nonrelated criminal matter. Defense counsel in the case here had been privately retained.

On August 18, 2000, counsel for the defendant filed a motion to withdraw. Shortly thereafter, the defendant sent a letter to the state's attorney asking that new counsel be appointed for him. Counsel's motion was heard on September 11, 2000. The defendant represented to the court that counsel would not do what he wanted him to do, and counsel indicated that it was not possible to do some of the things the defendant had requested. The court noted that there must be good cause to allow defense counsel to withdraw and that, to that point, it had heard only that counsel and the defendant did not like one another. In fact, the defendant conceded that he could work with counsel. The court denied the motion to withdraw. Thereafter, however, the defendant and counsel continued to raise the issue until they were ordered to begin jury selection on September 20, 2000.

"The standard of reviewing both a motion by a defendant to discharge counsel and a motion by counsel to withdraw is the same. . . . It is within the trial court's discretion to determine whether a factual basis exists for appointing new counsel and, absent a factual record revealing an abuse of that discretion, the court's refusal to appoint new counsel is not improper. . . . Moreover, appellate tribunals look with a jaundiced eye at complaints regarding adequacy of counsel made on the eve of trial . . . . Such a request must be supported by a substantial reason and, [i]n order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Fisher*, 57 Conn. App. 371, 382, 748 A.2d 377, cert. denied, 253 Conn. 914, 754 A.2d 163 (2000).

On the basis of our review of the record, we conclude that it fails to disclose any factual representation by defense counsel or the defendant constituting good cause to grant the motion to withdraw. See Practice

Book § 3-10 (a). Furthermore, counsel's motion to withdraw and the defendant's letter were filed on the eve of trial. The court therefore did not abuse its discretion when it refused to grant counsel's motion to withdraw.

IV

The defendant claims that the court improperly denied his motion to recuse. We disagree.

Just prior to the start of jury selection, the defendant filed a motion asking the judge to recuse himself. The basis of the defendant's motion to recuse was the judge's having sentenced the defendant, on April 9, 1996, in a prior criminal matter. According to the defendant, at the time of sentencing, the judge told him that he would "throw the book at him" if the defendant ever appeared before him again. The judge stated that he had no recollection of the sentencing and doubted that he had said such a thing. The judge refused to continue the case and proceeded with jury selection, but gave the defendant an opportunity to obtain the transcript of the sentencing. Thereafter, the defendant obtained a copy of the transcript of the April, 1996 sentencing and renewed his motion to recuse.[10] During argument before the court, the prosecutor noted that there could be no prejudice to the defendant, as he had violated his probation in the 1996 matter and that the probation violation had been adjudicated by another trial judge. The judge denied the motion, noting that the jury was going to determine the facts and that there is an appellate process that the defendant could access to determine whether the his rulings were improper.

---

[10] The April, 1996 sentencing involved three charges of risk of injury to a child. The court imposed a ten year term of incarceration, execution suspended. At that time, the court stated: "Sir, I want to tell you one thing. Your counsel knows me—don't come back, because you'll do the ten years. I'm going to be here awhile. There's better things in life to do than this nonsense."

"Accusations of judicial bias or misconduct implicate the basic concepts of a fair trial. *Cameron* v. *Cameron*, 187 Conn. 163, 168, 444 A.2d 915 (1982). The appearance as well as the actuality of [partiality] on the part of the trier will suffice to constitute proof of bias sufficient to warrant disqualification. Id., 170. The standard that we employ on appellate review is whether a reasonable person who is aware of the circumstances surrounding the judicial proceeding would question the judge's impartiality. *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 745–46, 444 A.2d 196 (1982); *Keppel* v. *BaRoss Builders, Inc.*, 7 Conn. App. 435, 440–41, 509 A.2d 51 [cert. denied, 201 Conn. 803, 513 A.2d 698] (1986)." (Internal quotation marks omitted.) *DeMatteo* v. *DeMatteo*, 21 Conn. App. 582, 590–91, 575 A.2d 243, cert. denied, 216 Conn. 802, 577 A.2d 715 (1990).

We conclude that there was no appearance of impropriety on behalf of the trial judge in this matter and that the defendant misconstrues the comments made by the judge at the prior sentencing. The judge did not threaten the defendant not to appear before him again because he would "throw the book at him." At the 1996 sentencing, the judge took time to warn the defendant that if he violated the terms of his probation, the court would order him to serve the entire ten year suspended sentence. See footnote 10. Nothing in the judge's comments indicated that he would be unfair to the defendant in that or any matter. We also note, as the court did, that it was for the jury, not the court, to determine the defendant's guilt.

V

The defendant's fifth claim is that the court improperly denied his motion for a judgment of acquittal.[11] On

---

[11] At the close of the state's case-in-chief, the defendant filed a motion for a judgment of acquittal. The defendant also filed a postverdict motion for a judgment of acquittal. The court denied both motions.

appeal, the defendant argues that there was insufficient evidence to convict him of the allegations contained in the second, third and fifth counts of the substitute long form information. Count two alleged that the defendant committed sexual assault in the first degree between 1994 and September 4, 1995; count three alleged that the defendant committed sexual assault in the second degree between September 5, 1995, and 1996; and count five alleged that the defendant committed risk of injury to a child between 1994 and 1996. We agree with the defendant, and the state concedes, that there was no evidence to support the defendant's conviction of sexual assault in the second degree between September 5, 1995, and 1996, as the victim had been removed from his care at that time. We do not agree with the defendant's remaining claims of insufficient evidence.

"[T]he standard of appellate review of a denial of a motion for a judgment of acquittal [challenging the sufficiency of the evidence] has been settled by judicial decision." (Internal quotation marks omitted.) *State* v. *Jackson*, 75 Conn. App. 578, 584, 816 A.2d 742 (2003). "[W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 667, 804 A.2d 810 (2002).

The state presented evidence from the victim's therapists, Gibson and Patlikh, that the defendant had sexually abused her from the time she was four until she was eleven years old. The victim became twelve years old on September 5, 1994. The record also contains evidence that the victim had lived with the defendant in the town of S after her parents separated in 1993

until she was removed from his care in 1994 or 1995. Consequently, there was sufficient evidence from which the jury reasonably could have concluded that the defendant was guilty of sexual assault in the first degree and risk of injury to a child occurring in 1994 as alleged in the second and fifth counts of the substitute long form information.

We therefore affirm the judgment of conviction as to the allegations contained in counts two and five, and reverse the judgment of conviction as to count three.

VI

The defendant's sixth claim is that the court failed to provide him an in camera review of the juvenile file in the neglect proceeding and that following an in camera review of the victim's Juvenile Court records, the court improperly refused to disclose the records to him. We are not persuaded.

We first review the procedural history of the defendant's claim. On September 7, 1999, the defendant filed a motion for production and disclosure of all exculpatory information or material, including all juvenile records, all psychological examinations or case studies of the victim, all statements by the victim and all exculpatory evidence in which she "vindicated the actions of the defendant." The defendant supplemented the motion by memorandum dated October 28, 1999, in which he sought, pursuant to General Statutes §§ 17a-28, 17-47a, 46b-142 and 52-14e, production of the juvenile records and Juvenile Court records of the victim. The record does not indicate that the defendant's September, 1999 motion was acted on by the court.

On September 20, 2000, prior to jury selection, defense counsel informed the court that he did not have access to the juvenile file and that his appearance in the matter had been returned to him. He further repre-

sented that he believed that the juvenile file contained exculpatory material. He asked the court to review the juvenile file and to determine what portions of the file he could review to cross-examine the victim.[12] The court ordered that the Juvenile Court records be placed under seal and given to the clerk of the Superior Court, and that the court would review the file after the victim testified to determine whether it contained exculpatory information. The defendant objected, claiming that the records should be made available to him at the start of trial rather than during the middle of trial.

After Gibson, one of the victim's therapists at the home, had testified, the defendant asked the court that he be permitted to conduct an in camera review of the victim's juvenile records to determine whether they contained evidence contradicting the testimony of witnesses or provided other exculpatory evidence. Counsel noted that the defendant was a party to the neglect proceedings and that the victim had been removed from his care. The court did not rule at that time.

At the close of the state's case-in-chief, the defendant again asked that the court turn over the victim's juvenile file concerning the neglect proceeding. The defendant believed that the juvenile file would demonstrate that the victim had not suffered sexual abuse by the defendant, that the agents of the department of children and families had dropped an investigation of sexual misconduct by the defendant for lack of evidence, and that the victim had alleged that she was molested by third parties, not the defendant. In the alternative, the defendant requested that the court conduct an in camera review of the file. The prosecutor objected to the defendant's reviewing the juvenile file, arguing that the court,

---

[12] As previously noted, the victim was incapable of testifying in this matter. On appeal, the defendant does not claim that his right to cross-examine her was violated.

not the defendant, was the proper entity to conduct an in camera review of the juvenile file. The court agreed with the prosecutor and reviewed the juvenile file in camera. The court found no exculpatory information to disclose to the defendant.

On appeal, the defendant claims that the court improperly denied him access to the victim's Juvenile Court records arguing that he was entitled to review the contents of the file because (1) he was the victim's father and a party to the juvenile proceeding, and (2) the records contain exculpatory information. At oral argument on appeal, the defendant asked this court to conduct an in camera review of the juvenile *record*, including the transcript of the proceedings in the Juvenile Court. At trial, the defendant requested that only the file of the proceeding before the Juvenile Court be submitted to the clerk. During trial, the court conducted an in camera review of the juvenile file and thereafter sealed it. We have reviewed all of the motions filed by the defendant in the criminal matter and the transcript of the argument before the court. At no time did the defendant request that the court review the transcript of the juvenile proceeding, and to the extent we are able to ascertain, the defendant never requested that the transcript be sealed and placed with the trial court.[13] We therefore have conducted an in camera review of the juvenile file only.[14]

The defendant argues without citation to any authority that the applicable standard of review is de novo.

[13] The defendant's motion for the juvenile proceedings file states in part: "The defendant . . . through counsel requests that he be given the juvenile file to inspect regarding a neglect petition filed by the department of children and families. . . . On or about the 6th day of January, 1995 the department of children and families filed a neglect petition regarding his daughter who is the alleged victim in the above entitled matter . . . . The defendant . . . is a *party* to said action . . . ." (Emphasis added.)

[14] It is the appellant's duty to provide an adequate record on appeal. Practice Book § 60-5.

The state argues that the abuse of discretion standard governs our review of the court's decision whether to release the victim's juvenile file. See *State* v. *Olah*, 60 Conn. App. 350, 354, 759 A.2d 548 (2000). The defendant's appellate claim is in two parts: One, that the court improperly refused to turn the juvenile file over to him pursuant to General Statutes (Rev. to 1999) § 46b-124 because he was a party to the action and also because he is the victim's father; and, two, that the court failed to disclose exculpatory evidence to him following its in camera review.

The defendant's first claim is that he was entitled to an in camera review of the victim's juvenile file because he was a party to the action and because he is the victim's father. The claim requires us to construe § 46b-124 as it applies to the facts of this case.

We construe statutes pursuant to a plenary standard of review. See *State* v. *Sanchez*, 75 Conn. App. 223, 232, 815 A.2d 242, cert. denied, 263 Conn. 914, 821 A.2d 769 (2003). "[T]o the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. Where, however, the trial court has drawn conclusions of law, our review is plenary, and we must decide whether those conclusions are legally and logically correct in light of the findings of fact." *State* v. *Velasco*, 248 Conn. 183, 189, 728 A.2d 493 (1999).

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, [231 Conn. 418, 431, 650 A.2d 557 (1994)]. In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the

legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Bender* v. *Bender*, [258 Conn. 733, 741, 785 A.2d 197 (2001)]. Thus, this process requires us to consider all relevant sources of the meaning of the language at issue . . . ." (Internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003) (en banc).

General Statutes (Rev. to 1999) § 46b-124 (a) provides in relevant part: "All records of cases of juvenile matters . . . shall be confidential and for the use of the court in juvenile matters, and open to inspection or disclosure to any third party . . . only upon order of the Superior Court, except that . . . such records shall be available to . . . (B) *the parents or guardian of the child or youth until such time as the child or youth reaches the age of majority* or becomes emancipated . . . ." (Emphasis added.) The statute does not mention parties.

The defendant claims that because he was a party in the action and because he is the victim's father, the juvenile file should have been provided to him for an in camera review. The legislative history and purpose of § 46b-124 was addressed by our Supreme Court in *In re Sheldon G.*, 216 Conn. 563, 583 A.2d 112 (1990). "The history of § 46b-124 begins with the enactment of legislation in 1921 that created a separate system of Juvenile Courts. That legislation directed that the records generated by Juvenile Court proceedings be kept separately from other court records, but at the same time it implicitly conferred upon Juvenile Court judges broad discretion to open those records for 'public inspection.' Public Acts 1921, c. 336. A legislative amendment in 1941 limited public access to juvenile records 'only to persons having a proper interest therein and upon order of the court.' General Statutes (Sup.

1941) § 283f. The 1941 amendment, however, continued to authorize judicial discretion to determine precisely who might have 'a proper interest' in the information contained in Juvenile Court records. Juvenile Court judges construed this provision to authorize disclosure of juvenile records 'whenever in the opinion of the court it is in the best interests of a child.' Practice Book, 1963, § 1137 [now 35-5].[15]

"In 1969, the legislature significantly amended the juvenile records statute in order to strengthen its confidentiality provisions. The 1969 amendment expressly provided that records of cases brought before the juvenile courts, 'including studies and reports by probation officers, social agencies, and clinics, *shall be confidential and for the use of said court*, and open to inspection or disclosure to any third party only upon order of said court.' . . . Public Acts 1969, No. 794, § 3. Although the amended statute was not designed to eliminate all judicial discretion to order disclosure, it was expected to tighten the authority of the court to prevent indirect disclosure by others." (Emphasis on original.) *In re Sheldon G.*, supra, 216 Conn. 569–70. There is, therefore, a presumption of confidentiality with respect to Juvenile Court records. Id., 571; see also *In re Brianna B.*, 66 Conn. App. 695, 699, 785 A.2d 1189 (2001); *State* v. *Streater*, 36 Conn. App. 345, 351, 650 A.2d 632 (1994), cert. denied, 232 Conn. 908, 653 A.2d 195 (1995).

*In re Sheldon G.* involved a delinquency proceeding, but the principles of confidentiality embodied in § 46b-124 and discussed in *In re Sheldon G.* are analogous and applicable to confidential material in termination of parental rights cases. *In re Amy H.*, 56 Conn. App.

---

[15] Practice Book § 35-5 (c) provides: "No material contained in the court record, including the predispositional study, medical or clinical reports, school reports, police reports and the reports of social agencies, may be copied of otherwise reproduced in written form in whole or in part by the parties or their counsel without the express consent of the court."

55, 62, 742 A.2d 372 (1999). "Juvenile Court records pertaining to neglect proceedings and encompassing information from [the department of children and families] are confidential and subject to disclosure to third parties only upon court order." *State* v. *Howard*, 221 Conn. 447, 459 n.10, 604 A.2d 1294 (1992); *State* v. *Whitfield*, 75 Conn. App. 201, 210–13, 815 A.2d 233, cert. denied, 263 Conn. 910, 819 A.2d 842 (2003).

We therefore proceed under the presumption that the victim's juvenile records should remain confidential. Although neither the state nor the defendant brought to our attention the fact that the victim was an adult at the time of trial; see footnote 3; that fact is critical to our application of the statute to the defendant's claim that he was entitled to see the file because he is the victim's father. Section 46b-124 provides an exception to the confidentiality provision for the parent of the child *until the child reaches the age of majority.* The defendant, therefore, was not entitled to conduct an in camera review of the victim's juvenile records at the time of trial simply because he was her father.

Furthermore, even if the defendant, as the victim's father, had a right to see the juvenile file, he could not have disclosed the contents of the file at trial without the permission of the court, as the jury, the prosecutor, witnesses and other persons in the courtroom were third parties to whom the contents of the file could not be disclosed. "Although the court has discretion to order disclosure of records, its discretion must be informed by the policies that the statute is intended to advance. . . . While § 46b-124 does not create a statutory privilege against disclosure of juvenile records for family members of the child who is the subject of proceedings in juvenile matters, it is, however, appropriate to consider the nature of the information generally contained in the juvenile records to decide whether the records should remain confidential." (Citation omitted;

internal quotation marks omitted.) *In re Amy H.*, supra, 56 Conn. App. 63–64.

The defendant also claimed that he should have been permitted an in camera review of the juvenile file because he was a party to the proceeding. In the alternative, the defendant requested that the court conduct an in camera review and disclose to him exculpatory information, particularly information supporting his belief that the victim had been abused by someone else. The presumption of confidentiality of Juvenile Court records may be overcome by the demonstration of a compelling need. *In re Sheldon G.*, supra, 216 Conn. 584; *In re Amy H.*, supra, 56 Conn. App. 62.

"We review the court's conclusion that the defendant was not entitled to an in camera review of the confidential documents pursuant to our standard of review for the court's evidentiary rulings. See *State* v. *William C.*, 71 Conn. App. 47, 62, 801 A.2d 823 (access to confidential records should be left to discretion of trial court), cert. granted on other grounds, 262 Conn. 907, 810 A.2d 277 (2002); *State* v. *Manini*, 38 Conn. App. 100, 114, 659 A.2d 196, cert. denied, 234 Conn. 920, 661 A.2d 99 (1995). The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. . . . *State* v. *Manini*, supra, 114." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 75 Conn. App. 381.

The court conducted an in camera review for material that would benefit the defendant in this criminal proceeding and concluded that the juvenile file contained no such information. We have conducted an in camera review of the juvenile file in the neglect proceeding and found that it contains nothing that exculpates the defendant. Our impression, in fact, is that it does not

contain even an implication that the victim suffered sexual abuse by someone other than the defendant.

Furthermore, as to the defendant's claim that he should have been permitted to present evidence that the victim had alleged that other individuals had sexually abused her, Patlikh, another of the victim's therapists, testified that the victim had disclosed to her that not only the defendant, but also an uncle and another male had sexually abused her. The defendant cross-examined Patlikh on that evidence as well. Consequently, there was evidence before the jury of sexual abuse against the victim by someone other than the defendant.

The court, therefore, properly refused to disclose the victim's juvenile record to the defendant.

## VII

The defendant's final claim is that the state violated his federal and state constitutional rights against double jeopardy by alleging a continuing courses of conduct in two counts. More specifically, the defendant claims that it was improper for the state to allege a continuing course of sexual assault and risk of injury occurring at the town of B when the victim lived with both of her parents and, in separate counts, a continuing course of sexual assault and risk of injury occurring at the town of S where the victim lived with the defendant alone. In other words, the defendant claims that a continuing course of conduct is just that and that it cannot be segmented by time and place. The defendant's claim lacks merit.

The defendant did not preserve his claim in the trial court and asks this court to review the claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[16] The record is adequate for our review, and

[16] A defendant can prevail on a claim of unpreserved constitutional error "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional

claims of double jeopardy are constitutional in nature. See *State* v. *Chicano*, 216 Conn. 699, 705, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). We conclude, however, that a constitutional violation did not clearly exist and that the defendant was not deprived of a fair trial.

The fifth amendment to the United States constitution provides that no person shall be subject for the same offense to be twice put in jeopardy of life or limb. The fifth amendment is applicable to the states through the fourteenth amendment to the constitution. *State* v. *Woodson*, 227 Conn. 1, 7, 629 A.2d 386 (1993). "This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial." Id. "The double jeopardy analysis in the context of a single trial is a two part process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . The defendant on appeal bears the burden of proving that the prosecutions are for the same offense in law and fact." (Citation omitted; internal quotation marks omitted.) *State* v. *Kulmac*, 230 Conn. 43, 67, 644 A.2d 887 (1994).

The defendant concedes in his brief that there is no double jeopardy question when the state charges multiple acts of specific sexual assault as separate offenses when those counts do not arise out of the same act or transaction. See id., 67–69; see also *State* v. *Snook*, 210 Conn. 244, 265, 555 A.2d 390 (charges did not arise out of same transaction), cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989). The

violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

defendant's claim is founded on the allegation that his sexual assault of the victim was a continuing course of conduct. Because the state could not prove a specific date on which the defendant assaulted the victim, it charged him with various acts of sexual assault and risk of injury to a child occurring in the town where the victim first lived with both of her parents and also in the town where the victim lived with the defendant alone. The state properly charged the defendant with a course of sexual conduct in one town and a course of sexual conduct in another town, which occurred at different times. The state, therefore, did not violate the defendant's double jeopardy rights.

The judgment of conviction as to count three is reversed and the case is remanded with direction to render a judgment of not guilty as to that count and for resentencing in accordance with law. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.